PACKAGE MACHINERY COMPANY, Plaintiff,

v.

HAYSSEN MANUFACTURING COMPANY, William A. Hayssen, Henry E. Knoechel, and Alfred Gausman, Defendants.

No. 55-C-15.

United States District Court
E. D. Wisconsin.
Aug. 25, 1958.

---

Howard J. Churchill of Byerly, Townsend, Watson & Churchill, New York City, Ira Milton Jones, Milwaukee, Wis., for plaintiff.

Curtis B. Morsell of Morsell & Morsell, Milwaukee, Wis., Herbert S. Humke of Bassuener, Humke, Poole & Axel, Sheboygan, Wis., for defendants.

GRUBB, District Judge.

This is an action, commenced January 20, 1955, grounded upon alleged unfair competition.

In April 1954, plaintiff purchased from its predecessor, Transparent-Wrap Machine Corporation, hereinafter referred to as Transwrap, its assets and business of manufacturing automatic packaging machines which operate to form individual, sealed packages, each filled with a measured quantity of a product.

About the time of the sale of Transwrap to plaintiff, Henry Knoechel, Alfred Gausman, Ludwig Feurstein and John Nosal gave notice of their termination of employment with Transwrap and entered into the employment of the Hayssen Manufacturing Company, hereinafter referred to as Hayssen Co.

Plaintiff asserts defendants Hayssen Co. and William Hayssen wrongfully induced Henry Knoechel, Alfred Gausman, Ludwig Feurstein and John Nosal to terminate their employment with plaintiff and to disclose to defendant Hayssen Co. Transwrap's trade secrets, and that defendants obtained and utilized those secrets.

Plaintiff demanded $150,000 damages, and that defendants Hayssen Co., William Hayssen, Henry Knoechel and Alfred Gausman be enjoined from utilizing the trade secrets and confidential information, and that the Hayssen Co. be enjoined from using the services of Knoechel and Gausman further.

Hayssen Co., Hayssen, Knoechel and Gausman raise the following defenses, among others:

That Knoechel, Gausman, Feurstein and Nosal were not induced to leave plaintiff by the Hayssen Co., but that when Transwrap was sold to plaintiff, they found they could not obtain desirable employment conditions with plaintiff, and thus they sought employment elsewhere; that the skills Hayssen Co. received from these men were not trade secrets, but were matters of mechanical skill; that any such knowledge retained by these men had also been publicly circulated, had been disclosed in previously expired patents and in the machines of plaintiff and other manufacturers on the market; that Alfred Gausman's skill in the area was acquired before he was employed by Transwrap.

September 6, 1955, defendants moved for a more definite statement asking, among other things, for a more specific statement of what the trade secrets were that they were allegedly utilizing.

February 24, 1956, plaintiff filed a motion for a temporary injunction to restrain defendants from utilizing plaintiff's trade secrets. In support of its motion, plaintiff filed an affidavit of Walter Zwoyer, which was somewhat more specific in naming trade secrets, but in the main was very general. It was conceded at the time of the hearing on the motion for a temporary injunction that if granted, this injunction would throw a large number of men out of employment, as well as disrupt and close down a very large part of the business of Hayssen Co.

In a hearing on May 28, 1956, the court denied defendants' motion for a more definite statement, but indicated that the alleged trade secrets were not sufficiently specific; that before the case would be tried, *the alleged trade secrets were to be pin-pointed at the pre-trial conference.* (Tr. pp. 161–163)

The court having considered plaintiff's motion for a temporary injunction on the same date, and having denied the same, in a letter dated June 20, 1956, plaintiff's counsel requested that this case be given priority for an early trial date.

In spite of the fact that immediately before plaintiff's counsel made his request for an early trial date, the court had indicated that plaintiff would have to make its allegations of trade secrets more specific at the pre-trial conference, nine months later, at the time of the pre-trial conference, plaintiff was not prepared to state what the alleged trade secrets were.

Plaintiff, both before and after the pre-trial conference, and prior to the various motions requiring plaintiff to specify the trade secrets it claimed were pirated, held extensive discovery proceedings. In addition to regular depositions, it examined drawings, blueprints, models and equipment at defendant Hayssen Co.'s plant in detail.

March 6, 1957 the court entered a pre-trial order requiring the plaintiff to file a "bill of particulars" on or before April 15, 1957, specifying the trade secrets plaintiff claimed were pirated by Hayssen Co. or by any of the other defendants or former employees of Transwrap.

April 15, 1957 plaintiff filed a "bill of particulars" purporting to set forth such trade secrets as it claimed were involved.

July 26, 1957, at a hearing on defendants' motion to require compliance with the court's pre-trial order, and more particularly to obtain more specificity from plaintiff in its claims of alleged trade secrets wrongfully pirated, the court considered in detail each paragraph of plaintiff's "bill of particulars". At this hearing, seventeen months after plaintiff asked the court to enjoin the defendants from utilizing its trade secrets, and thirteen months after plaintiff asked for an early trial, the court found 22 of plaintiff's 24 statements of claimed trade secrets too general for the court or defendants' counsel to be able to determine what the issues of fact would be; what alleged trade secrets plaintiff claimed were pirated.

The discussion of paragraphs F and G of plaintiff's "bill of particulars" at the July 1957 hearing, demonstrates the further need for specificity, even at that late date, two and one-half years after the suit was commenced.

Paragraph F of plaintiff's "bill of particulars" claimed: "The types of feeds and modifications of the same used in packaging the various types of products for such Transwrap customers." At the hearing counsel and the court discussed this claim as follows:

"Mr. Morsell: My suggestion on that—if I may interrupt—is that much, for instance, is very general, relating to types of feeds, and modifications, used in packaging. Transwrap customers might have packaged a thousand different products, and by admissions in this case there are innumerable types of feeds and modifications. All we are asking for is that they specify specifically the feeds and modifications they are complaining about.

"The Court: Why shouldn't that be done?

"Mr. Churchill: If your honor please, the feeds took quite a few forms. There were auger feeds, there were scale feeds, there were volumetric feeds, and there are modifications of those feeds for handling different types of films and for handling different types of products, so that one of the fundamental points in this whole case which the plaintiff is going to make as proof of theft of trade secrets is that by hiring these men, and only by virtue of hiring these men, the defendant, Hayssen Manufacturing Company, was able to know how this basic machine—Transwrap machine—can be modified in a hundred different ways by utilizing sometimes an auger

feed, other times a scale feed, sometimes using cellophane, other times using pliofilm, sometimes using electronic sealing.

"The Court: How many types of feeds are there?

"Mr. Churchill: There are four basic feeds.

"The Court: Do you claim there are four basic feeds where trade secrets were taken away and utilized by these men?

"Mr. Churchill: I say the four basic feeds in combination with the various modifications.

"The Court: How many combinations and modifications?

"Mr. Churchill: *We estimate there are a hundred different modifications of films, feeds, and sealing devices.* (Emphasis supplied.)

"The Court: You claim these men took a hundred trade secrets—

"Mr. Churchill: They took the knowledge, which represented · the cumulative knowledge of how to adapt these machines, feeds, and modify the same to handle a full scale of products.

\*　\*　\*　\*　\*　\*

"The Court: What I want to do is keep this on particular trade secrets, not skills or knowledge that these men acquired. It seems to me that under F, if you do litigate a hundred different types of feeds or wraps, you probably aren't seriously making any claim that there were a hundred of those that were trade secrets. Let's get it right down to what you claim were trade secrets and which were wrongfully transmitted to defendant.

\*　\*　\*　\*　\*　\*

"The Court: *We are trying to narrow the issues. Let's forget about the shotgun charge that all these trade secrets enabled them to do this. Let's get down to what do you claim they took.* (Emphasis supplied.)

"Mr. Churchill: The knowledge of the various types of feeds.

"The Court: Let's specify the types of feeds. You had an opportunity to, and if you haven't had an opportunity you have a right to examine these men by discovery procedures of various kinds. But let's specify just what type of feed they took that you claim was a trade secret by description by words, by diagram, by something, that we are not dealing with a hundred types of feeds. There must be types of feeds that aren't trade secrets. You can go right over to the store and buy one, look at it and see what it is. Let's narrow it to those you claim were trade secrets and which were improperly communicated to the defendant Hayssen Manufacturing Company.

"Mr. Churchill: If your honor please, the types of feeds and modifications of the same used in packaging the various types of products. That will add up to a hundred different machines.

"The Court: All right. Just specify the hundred different machines you claim, and diagram them. Let's find out what you claim was a trade secret that was improperly communicated to and used by the defendant. If there are a hundred, let's have a hundred, *but let's have it specific so when this case comes on for trial, or if the defendant wants to take further discovery on those matters they will know what the issues are going to be and the court will know what the issues are going to be, and we won't come in here with a broad shotgun charge and be weeks putting in testimony on matters that could be handled in very short order. I think they are entitled to have that made very definite.* (Emphasis supplied.)

\*　\*　\*　\*　\*　\*

"The Court: You should depict everything that you claim was im-

properly taken as a trade secret, communicated to and used by the defendant. You couldn't try the case without knowing what you are going to claim. Let's get it prepared and find out what you are going to claim. *In other words, let's prepare the case and narrow the issues in advance, not after it has come on for trial.* I think defendant is entitled to have a list and description of these various modifications and feeds covered by F that you claim were trade secrets which were improperly communicated to the defendant Hayssen." (Emphasis supplied.) (Tr. pp. 19–25)

Paragraph G of the "bill of particulars" claims as a usurped trade secret: "The types of sealing arrangements and cut-off devices supplied to such customers in handling the specific products and films involved." At the hearing counsel and the court discussed the claim as follows:

"Mr. Morsell: G we have not disposed of, and that relates to the types of sealings and cut-off devices supplied to such customers in handling the specific products and films involved.

"That does not charge there was any written list or any written information on that and, to explain, I would like to tell the court that in these machines they can use any of hundreds of types of film material as supplied by du Pont, or any of the manufacturers of pliofilm, cellophane—all those chemical corporations. They all go under different trade names. The objective of the companies that manufacture these film materials for wrapping is to sell their material. They come out with a new material, and they seek to sell it to users of it. I have in my office a stack of material that high (indicating) on written instructions sent out by the companies, the manufacturers of the film material. They tell users exactly what films

are adaptable to what products, what degree of heat to use in sealing them, and what their characteristics are as to moistureproof or—all of that sort of thing.

"Now, when he said 'The types of sealing arrangements and cut-off devices supplied to such customers in handling the specific products and films involved,' that is so general it is impossible to meet it. There might be dozens of sealing arrangements. You could have a heat seal that would operate at a certain degree according to the instructions given by the manufacturer of that film, and a cut-off device for cutting it clearly. We should know, certainly, the types of sealing arrangements he is talking about, and the cut-off devices.

"The Court: Mr. Churchill, why can't you specify what sealing arrangements and cut-off devices that you claim are wrongfully—

"Mr. Churchill: I will, your honor." (Tr. pp. 29–31)

At the hearing of July 26, 1957, the court again trying to set a date when the claimed trade secrets would be listed, Mr. Churchill, plaintiff's counsel, stated he would like to have until after the court ruled on certain issues before he submitted his amended statement of trade secrets. (Tr. p. 68) The ruling was handed down September 20, 1957.

Counsel for defendants consented to even further extensions from time to time until March 1, 1958 when plaintiff's witness, Mr. Zwoyer, died. Plaintiff's counsel requested another lengthy extension. The court extended the time to May 15, 1958 and stated to plaintiff's counsel that this would be the last extension and that if the amended statement of trade secrets was not forthcoming on time, the court would entertain a motion by defendants to strike plaintiff's pleadings.

May 15, 1958, plaintiff filed another request for an extension stating it needed time to consider whether it had a

prima facie case,* over three years after it commenced the action, over two years after it sought a temporary injunction to restrain defendants from utilizing its trade secrets, and two years after plaintiff asked to have this case given priority for an early trial.

Defendants filed a motion to strike plaintiff's complaint for failure to obey the court order and for failure to prosecute.

June 4, 1958 the court struck plaintiff's complaint with leave to apply for reinstatement within twenty days from the entry of the order on such terms as the court sees fit to impose. The court also instructed defendants' counsel that if plaintiff made a motion to reinstate, defendants' counsel was to present an affidavit-form of proof of the added expense to which defendant had been put because of the numerous delays and numerous motions.

June 20, 1958 plaintiff filed a motion to reinstate the complaint on the grounds—

(a) That under the F.R.C.P. plaintiff could not be compelled to file an amended bill of particulars.

(b) That the court abused its discretion in denying an extension to file an amended bill of particulars.

(c) That the court cannot dismiss a complaint for failure to file a bill.

Or, for an order reinstating the complaint on the conditions—

(a) That plaintiff have 90 days in which to file an amended bill of particulars.

(b) That all proceedings in this case be stayed for 90 days.

(c) That plaintiff shall not be deemed to have waived its right to appeal from the orders—

(1) Requiring an amended bill of particulars.

(2) Denying an extension of time to file its amended bill.

(3) Striking the complaint for failure to file a bill.

Defendants made a motion to dismiss the action on the ground that plaintiff had failed to comply with the pre-trial order and had made no motion within twenty days from the order striking the complaint for reinstatement on such terms as the court might find just to impose.

Plaintiff takes the position that the court had no power under the F.R.C.P. to order a "bill of particulars". The term "bill of particulars" was first introduced into this case by plaintiff in a memo filed May 2, 1956. There plaintiff urged defendants' motion for a more definite statement was in reality a motion for a bill of particulars, whereas, defendants were entitled to only so much as would enable them to plead.

Although the court erroneously adopted plaintiff's counsel's term, it did so in

---

* Plaintiff's counsel complains of this statement by the court and suggests plaintiff's request was for time to consider whether it would *now* be able to prove its prima facie case.

Mr. Churchill's affidavit of May 13, 1958 reads in part as follows:

"The death of Mr. Zwoyer places plaintiff and its counsel under an extreme handicap. Not only was plaintiff placed in the unhappy position of having to evaluate its whole case from the standpoint of whether it will be able now to prove its prima facie cause of action, *but also to ascertain to what extent the additional factual data required to be supplied in an Amended Bill of Particulars can now be put together without the aid of Mr. Zwoyer."* (Emphasis added.)

Counsel's motion indicates that even on May 13, 1958 plaintiff did not know what specific trade secrets it was claiming were pirated.

It was and is the opinion of this court that if plaintiff did not know what trade secrets were involved, it did not know whether it had a prima facie case.

Further, the court would like to make clear that it was not the death of Mr. Zwoyer that caused the dismissal of this case, but the failure of counsel to find out and specify the trade secrets upon which he was relying. Three years after the suit was commenced, counsel did not know or refused to specify for a pretrial order the basis of his case.

a context that clearly indicated plaintiff was required, as a part of the pre-trial order, to set forth its claimed trade secrets so that the issues could be narrowed for trial. Plaintiff's counsel could not have been misled into believing that it was anything but a pre-trial order requiring the plaintiff to specify what trade secrets it claimed were pirated so that the issues could be known and the trial confined to those issues.

Plaintiff's position entirely overlooks the fact that although called a "bill of particulars" this direction was a court order in an effort to narrow the issues so that days or weeks would not be consumed going into every detail of the operations of the defendant Hayssen Co. in the hope of finding something which the complainant could claim was a trade secret. There was a sincere effort made in this case to have the discovery complete and the issues outlined in the pre-trial order, rather than to use the trial as a discovery proceeding or a "fishing expedition" extending to undue lengths in a court where the calendar is all too far behind.

This direction by the court was not only within the court's power under Rule 16 of the F.R.C.P., 28 U.S.C.A., but it was the duty of the court to narrow the issues.

"The purpose of pre-trial conferences is to simplify the issues and eliminate waste of time and money by avoiding unnecessary proof of facts at the trial. McDonald v. Bowles, 9 Cir., 152 F.2d 741. * * *

"A pre-trial conference is more than a mere conference at which the court seeks to eliminate groundless allegations or denials and the court has the power to compel the parties to agree to all facts concerning which there can be no real issue. Berger v. Brannan, 10 Cir., 1944, 172 F.2d 241, 242, certiorari denied 337 U.S. 941, 69 S.Ct. 1519, 93 L. Ed. 1746." Holcomb v. Aetna Life Insurance Company, 10 Cir., 1958, 255 F.2d 577, 580.

The court was not required to stand by and permit plaintiff to rest on its general statements of claimed trade secrets and await the outcome of a long expensive trial to see what the alleged trade secrets were. Cf. Holcomb v. Aetna Life Insurance Co., supra. Nor should the defendants have to wait until plaintiff puts in its case to see what it has to defend against.

Throughout the many motions concerning whether plaintiff has made a definite enough statement of its claimed trade secrets, counsel for the plaintiff has repeatedly retreated to the position that he need only state so much as to enable the defendants to plead. Suffice it to say that counsel seems unaware of Rule 16 and the purpose of pre-trial conferences to eliminate unnecessary lengthy trials.

In an address before the American College of Trial Lawyers in April 1958, given under the title "Changes in Trial Tactics", Mr. Justice William J. Brennan, Jr. stated in part:

"* * * The public is fed up with systems under which neither side of lawsuit knows until the actual day of trial what the other side will spring in the way of witnesses or facts. The technique of playing the cards close to the vest and hoping by surprise or maneuver at the trial to carry the day, whether or not right and justice lies on the side of one's client, won't be tolerated. It was and is great sport, but hardly defensible as a system for determining causes according to truth and right. In pretrial procedure, made effective through a precedent broad discovery practice, lies the best answer yet devised for destroying surprise and maneuver as twin allies of the sporting theory of justice.

"* * * Pretrial discovery and pretrial conference procedures can truly be employed as a scalpel to lay bare the true factual controversy; * * *

" ' * * * As valuable as the procedure is to everyone, it will not work unless he makes it so by his leadership. The judge must vigorously lead the bar where they are not used to it or where they oppose it.' "

In quotations from the report of the proceedings on a Seminar on protracted cases in 1957, covering not only protracted cases in the sense of anti-trust cases but also patent cases and all cases which are protracted or which would become protracted unless the issues were narrowed and pin-pointed at pre-trial conferences and admissions obtained insofar as facts are not in dispute, as reprinted in 21 F.R.D. 395, we find the following statements:

"No one can really quarrel with the recommendation of the Judicial Conference that 'promptly after the pleadings close, sufficient effort should be made by the court and counsel to particularize the issues. * * * ' " At page 436.

"In conclusion, let me say that it is my belief that a medium-size case is often made into a big case by the failure of the lawyers and the court to focus their early attention on what the case is all about. * * " At page 438.

" * * * Many judges have learned by experience, that they should have become 'iron-hearted' at an earlier date. * * * " At page 438.

" * * * It is recommended by the Prettyman Report, at page 8: 'At some time subsequent to the filing of the pleading, reduction of the generality of the complaint to specific disputed propositions must be made in the interest of efficient conduct of the trial and of proper disposition of the case.' * * * " At page 456.

"I want to summarize some points of agreement we have reached thus far. To quote from the Prettyman Report:

" 'The more specific the issue for trial, the less complicated and time-consuming the trial can be and the more accurate the results.' * * " At page 459.

"*Resolutions adopted at Seminar on long cases,* 1957.

"(9) Pre-trial requires methods for preliminarily limiting and clarifying issues. Early written factual statements of plaintiff's and defendant's case which may or may not be tentative are essential. The issues should be definitely defined, at the latest, by the final pre-trial order." At page 520.

"*Agenda for Pre-trial Conference No. 1*

"3. Statement of fact issues—no generalties. * * * " At page 527.

Counsel further urges the court was arbitrary in refusing to extend plaintiff's time further. Counsel was told in May 1956 that its claimed trade secrets were not specific enough. In the next two years counsel was granted extension after extension until finally directed in March 1958 to file an amended statement or the court would entertain a motion to strike plaintiff's pleadings. The court is of the opinion that plaintiff's counsel has been given every reasonable and fair opportunity by discovery and otherwise to determine what it claimed were trade secrets which were pirated so that the issues could be narrowed. Plaintiff's refusal to do so indicates either obstinacy or that it actually does not know or have any specific claims but hopes "to go on a fishing trip" in a protracted trial covering all of plaintiff's operations to find something it can claim as a trade secret. It indicates a complete lack of appreciation of the purpose and spirit of the federal rules and pre-trial procedure.

Defendants' motion to dismiss and the recital of facts in the court order of June 4, 1958 were based upon Rules 37 (b) (2) (iii) and 41(b) of the F.R.C.P. However, in the order presented for the court's signature, signed by both counsel, and apparently prepared by counsel

for the plaintiff inasmuch as it is affixed to Mr. Jones' backing, Rule 41(b) was not cited.

It was the intent of the court to strike the pleadings based upon the authority of Rule 41(b), Cf. Wisdom v. State of Texas, D.C.1939, 27 F.Supp. 992.

Plaintiff's motion to reinstate the complaint is denied and defendants' motion to dismiss the action is granted. Defendants may prepare an order pursuant to this decision, submitting it to plaintiff's counsel for approval as to form only.