**LIFE MUSIC, INC., Plaintiff,**

**v.**

**BROADCAST MUSIC, INC., American Society of Composers, Authors and Publishers, Sesac Inc., Radio Corporation of America, National Broadcasting Company, Inc., Columbia Broadcasting System, Inc., Columbia Records, Inc., Blackwood Music, Inc. (named incorrectly in the original complaint as Columbia Music Publishing Company), Master Records, Inc., and April Music, Inc. (named incorrectly in the original complaint as Okeh Music Publishing Company), Defendants.**

United States District Court
S. D. New York.
July 24, 1962.

O'Brien, Driscoll & Raftery, New York City, Edward C. Raftery, and William D. Friedmann, New York City, of counsel, for Life Music, Inc.

Rosenman, Colin, Kaye, Petschek & Freund, by Samuel I. Rosenman and Law-

rence R. Eno, New York City, for Broadcast Music, Inc.

Cahill, Gordon, Reindel & Ohl, by J. Willard O'Brien, New York City, for R.C.A. and N.B.C.

Cravath, Swaine & Moore, New York City, Bruce Bromley, New York City, of counsel, for Columbia Broadcasting System and other defendants.

EDELSTEIN, District Judge.

Just over two years ago this case was assigned to me for all purposes pursuant to Rule 2(b) of the General Rules of this court. Since that time twenty-three pre-trial conferences have been conducted resulting in a transcript in excess of 1100 pages. The hopes expressed by court and counsel for an early trial of this matter have dimmed considerably. The present impasse over definition of the issues necessitates this progress memorandum. I propose to deal with the literature relating to defining issues, to review the proceedings had herein on that aspect of the case and to deal with the proposals made by the parties for a definition of the issues.

## IMPORTANCE OF ISSUE DEFINITION

Trials of antitrust cases, consisting of complex legal and economic issues with voluminous records are generally protracted and expensive. The problems which these long involved cases pose for the courts in terms of manpower and time have led to extensive investigation of the subject by judges and commentators. See generally, Prettyman, Six Suggestions for Improvement, CCH ANTITRUST SYMPOSIUM, 1951 New York State Bar Assn. Report 34, (hereinafter cited as 1951 SYMPOSIUM); Procedure in Antitrust and other Protracted Cases, a report adopted by the Judicial Conference of the United States, September 26, 1951, reprinted at 13 F.R.D. 62 (hereinafter cited as PRETTYMAN REPORT); Report of the Committee on Practice and Procedure in the Trial of Antitrust Cases, American Bar Association Section of Antitrust Law, May 1, 1954, (otherwise known as the McALLISTER REPORT); Proceedings of the Seminar on Protracted Cases for United States Judges, held at New York University Law Center, August 1957, reprinted at 21 F.R.D. 395 (hereinafter cited as N.Y.U. SEMINAR); Proceedings of the Seminar on Protracted Cases for United States Judges, held at the School of Law, Stanford University, August 1958, reprinted at 23 F.R.D. 319 (hereinafter cited as STANFORD SEMINAR); Streamlining the Big Case—Report of the Special Committee of the Section of Antitrust Law, American Bar Association, September 15, 1958, (hereinafter cited as McLAREN REPORT); Handbook of Recommended Procedures for the Trial of Protracted Cases, Report of the Judicial Conference Study Group on Procedure in Protracted Litigation, adopted by the Judicial Conference of the United States, March 1960, reprinted at 25 F.R.D. 351 (hereinafter cited as HANDBOOK); see also Selected Bibliography, Trial of Protracted Litigation, 21 F.R.D. 533.

These studies and their attendant reports culminated in the Handbook of Recommended Procedures for the Trial of Protracted Cases which was adopted by the Judicial Conference of the United States in March 1960.

After stating the problem of the big case, the Handbook suggests that the solution lies, in part, in five basic steps.

"1. Early identification of the big case.

"2. Its assignment to one judge for all purposes, and his prompt assumption of control.

"3. Definition of the issues, which, it is increasingly recognized, should be accomplished through pre-trial conferences.

"4. Confining discovery within the boundaries set by the defined issues and the discovery rules.

\* \* \* \* \* \*

"5. Careful planning of the procedure to be followed at the trial, and full utilization of tested trial techniques." 25 F.R.D. 351, 373–374 (1960).

The immediate concern at this time is with the third of these steps, definition of the issues through pre-trial conferences. Before proceeding to an exploration of this problem some mention should be made of steps 1 and 2.

■ The complaint herein was originally filed on January 12, 1956. Not until October 16, 1959, almost four years later, was this case assigned to me for all purposes. Unfortunately, an early identification of this case was not made, resulting in a summary judgment proceeding, in various discovery motions and in other diverse problems prior to the court's assumption of control and supervision. Whether an earlier identification and assignment would have prevented the present difficulties over definition of the issues is conjectural. But it most certainly would have avoided some of these problems which have occurred heretofore and which may very well follow the definition of the issues at this time. The Handbook and the literature upon which it is based are in general agreement that defining the issues should precede discovery. The reason for this desirable order of precedence is more than formalistic, as I shall later illustrate. Thus, the usual problems encountered in any protracted case have been compounded due to the inability of the court to assume control at an early stage of the proceedings. The entanglement in which this court finds itself is eloquent testimony for the need of early identification and prompt assumption of judicial control in the protracted case.

■ The importance of defining the issues cannot be overemphasized. It is truly the key to a coherent, efficient, expeditious and manageable trial, and essential in order that the court effectively control the progress of the case. It is vital in order to keep extensive discovery within reasonable bounds and in order that discovery may be directed to the real issues in the case. Of the principal factors causing unnecessary delay, volume and expense, the Prettyman Report finds that vagueness of the issues is a prime factor. PRETTYMAN REPORT, 13 F.R.D. at 66. The pleadings cannot be relied upon to frame the issues with sufficient particularity to make the protracted case triable, figuratively speaking, especially where the trial is to be before a jury. See Walder v. Paramount Publix Corp., 155 F.Supp. 26 (S. D.N.Y.1957).

"Whatever may be the objections and difficulties to the specification of issues in ordinary actions, the necessity for such specification in the cases with which this report is concerned is so great as to require that it be done no matter what the objection or difficulty. Unless it is done, the hearing cannot be confined to its proper limits, counsel are at a loss as to their positions, and the judge is unable to relate the evidence to issues which are in dispute or to limit it to that which is relevant." PRETTY-MAN REPORT, 13 F.R.D. at 66–67. "The fact is that controversies of the scope and complexity of these trials cannot be resolved unless issues are framed and evidence directed to them, and them alone. This is not merely a philosophical fact; it is also a physical fact. \* \* \* [A] trial is for the determination of issues; issues are disputes; a dispute must concern a known subject; to be justiciable, the positions of the parties upon the subject must be known; to be persuasive, evidence must be understandable and definitive." 1951 SYMPOSIUM at 37.

Notwithstanding the obvious need for an early definition of the issues, counsel are generally reluctant to commit themselves at an early stage of the litigation.

See HANDBOOK, 25 F.R.D. at 388; STANFORD SEMINAR, 23 F.R.D. at 414. And, in some cases, a failure to prepare adequately prior to trial is an obstacle to an early specification of the issues. See PRETTYMAN REPORT, 13 F.R.D. at 67. "Neither of these conditions should prevent the court from insisting upon a specification of the issues which are in actual dispute and upon the elimination from the trial of all propositions not actually disputed." Ibid.

■ Absent a definition of the issues, extensive discovery can hardly be kept within manageable limits. Control of discovery and the definition of the issues are inextricably interwoven. That this is axiomatic is clear. See, e. g., HANDBOOK, 25 F.R.D. at 388; McLAREN REPORT at 9–11. Ideally definition should precede discovery. *But see* N.Y. U. SEMINAR, 21 F.R.D. at 446–47. Regrettably the ideal has not been entirely realized here, for some discovery has preceded the definition of the issues in the case at bar. However, discovery now will proceed only in conformity with the issues as defined and under the control of the court. It should not, of course, need to be repeated that the definition of the issues is merely tentative. The initial issue formulation is open to modification if justice so requires.

The proposed method for formulating the issues involves the use of pre-trial conferences. Initially, written proposals from each side are required, to be followed by conferences at which areas of agreement can be worked out. See HANDBOOK, 25 F.R.D. at 388. This approach has thus far been followed here, resulting in scant agreement and in an impasse. Although the literature on protracted cases is replete with procedures and suggestions based upon the hypothesis that agreement will be obtained, nowhere have I found any discussion of the eventuality which now faces this court except for some mention by Judge William F. Smith of the Third Circuit that agreement as to what are the triable issues may not be always forthcoming. N.Y.U. SEMINAR, 21 F.R.D. at 458. The suggested approach there was to incorporate the areas of agreement into a preliminary pre-trial order and hope that subsequent pre-trial conferences will be more productive. "The course of the litigation in advance of trial may be established and the permissible limits of discovery defined with some degree of certainty notwithstanding the absence of complete agreement on one or more, but not all, of the triable issues." Ibid. This alternative is, of course, less satisfying than a complete definition of the issues, and is in effect a compromise with the goal of pre-trial in protracted cases. Still another alternative, absent agreement, is to proceed without any issue definition at all, trying the case on the pleadings alone. Needless to say, this approach commends itself not at all. It runs counter to all the learning on the subject. The third alternative, and the one I adopt here, is to insist that the triable issues be defined and to enter a pre-trial order specifying the definition of the issues.

■ I have no doubt that the court has the power and the authority to define the issues where counsel have failed to agree as to what are the triable issues. Although the literature on protracted cases may be helpful in outlining in detail the procedures to be followed, the ultimate source of authority for pre-trial procedure is found in Rule 16, F.R.Civ.P. 28 U.S.C.A. That rule provides:

"In any action, the court may in its discretion direct the attorneys for the parties to appear before it for a conference to consider

"(1) The simplification of the issues;

\* \* \* \* \* \*

"The court shall make an order \* \* \* which limits the issues for trial to those not disposed of by admissions or agreements of counsel; and such order when entered

controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice."

Thus, in Brinn v. Bull Insular Lines, Inc., 28 F.R.D. 578 (E.D.Pa.1961) the court entered a pre-trial order narrowing the issues without the agreement of counsel. "If the pre-trial procedure is to have any meaningful purpose whatever, it is encumbent on the Court to narrow the issues reasonably and with discretion." 28 F.R.D. at 579. In Package Machinery Co. v. Hayssen Mfg. Co., 164 F.Supp. 904 (E.D.Wis.1958) aff'd, 266 F.2d 56 (7th Cir. 1959), a case involving trade secrets and unfair competition, the court held extensive pre-trial sessions where it attempted to get plaintiff to particularize and define the trade secrets which it claimed were stolen. Plaintiff repeatedly retreated to the position that it need only state so much as to enable defendant to plead. "This direction by the court was not only within the court's power under Rule 16 of the F.R.C.P., 28 U.S.C.A., but it was the duty of the court to narrow the issues. * * * The court was not required to stand by and permit plaintiff to rest on its general statements of claimed trade secrets and await the outcome of a long expensive trial to see what the alleged trade secrets were." 164 F.Supp. at 910; see also Holcomb v. Aetna Life Ins. Co., 255 F.2d 577, 580 (10th Cir. 1958). Accordingly, the complaint was dismissed.

Our own Court of Appeals has had occasion recently to consider pre-trial problems in the "big" case. In Syracuse Broadcasting Corp. v. Newhouse, 295 F.2d 269 (2d Cir. 1961), the question before the Court involved evidentiary problems and preclusion orders. Although the case does not deal with the problem at hand, it is useful for our purposes in that it demonstrates the emphasis to be placed on the value of cooperation and agreement in the big case and the pitfalls encountered in the absence thereof. 295 F.2d at 274. In an earlier appeal in the same case, 271 F.2d 910 (2d Cir.

1959), the Court reversed a dismissal made at pre-trial for failure to comply with a court order. The Court found that the preclusion order entered below was too strict. But the Court of Appeals recognized the need for special administrative treatment of the "big" case, especially with respect to the definition of the issues. Consequently, it approved generally of the need for "taking vigorous measures to see that the issues were clearly defined so that the whole case might be kept within manageable proportions." 271 F.2d at 915.

Neither of the two Newhouse opinions, nor Padovani v. Bruchhausen, 293 F.2d 546 (2d Cir. 1961), discussed in detail infra, forbid or prohibit the definition and particularization of the issues by the court where counsel have failed to agree. Indeed, the only contrary view appears to be a statement by Professor Moore in his treatise, without citation to any case. "The court should not impose on the parties its own views of what the issues are." 3 Moore, Federal Practice 1116 (2d ed. 1948). It should be noted that Professor Moore's discussion concerns pre-trial in general, without any special emphasis on the protracted case. "Interested persons have long been aware that the 'big' case, such as is often encountered in antitrust and patent litigation, requires special * * * treatment. (citations omitted.) Especially is this true with respect to * * * the formulization of the issues to be tried." Syracuse Broadcasting Corp. v. Newhouse, 271 F.2d 910, 914 (2d Cir. 1959). And in any event, as will be seen from the remainder of this memorandum, the definition of the issues adopted here is far from an imposition of the court's views on the parties. If, nevertheless, Professor Moore is read as denying the authority of the court to adopt the course which I follow here, I must disagree with that conclusion.

Streamlining the big case by defining and simplifying the issues is the *sine qua non* without which proper judicial

supervision of the protracted case is barely possible. To deny existence of the court's authority to define the issues where counsel fail to agree would make a mockery of all the extensive pre-trial procedures which courts have devised in an effort to reduce, as far as possible, the danger of chaos inherent in every protracted and complicated case. Moreover, denial of the power could very well mean the end of pre-trial itself and a return to the dark days of special pleading and trial by ordeal. I have hesitated in the exercise of this power in order to afford counsel every opportunity to arrive at a definition which would be mutually acceptable. Since this course has proven less than fruitful the court is now faced with the need for eliminating the impediments to defining the issues and progressing toward trial.

█ Having chosen the third of the alternatives discussed above, two approaches are available. On the one hand, the court can proceed to formulate the issues itself, based on the submissions of counsel and the court's familiarity with the case gained through extensive pre-trial conferences. The court should be more than an umpire between contending views. See Syracuse Broadcasting Corp. v. Newhouse, 295 F.2d 269, 277 (2d Cir. 1961). On the other hand, the court can accept without change the proposal of one side over that of the other. This litigation is, after all, an adversary proceeding in which counsel should be expected to present the best possible arguments in support of their respective contentions. I was originally disposed to adopt the former approach. After studying the most recent submissions of the parties, however, I find that there is a substantial identity in some portions of their respective proposals, although they hesitate to characterize it as an agreement. So much effort has been expended in an endeavor to obtain agreement that I propose, in resolving the definition of the issues, to build upon whatever accord has been reached. Before setting forth the court's rulings on the formulation of the issues, I shall review the efforts made in the pre-trial conferences to obtain agreement of counsel.

## REVIEW OF PRE-TRIAL CONFERENCES ON THE DEFINITION OF THE ISSUES

In reviewing the efforts thus far made to define the issues, I have chosen to commence from that point in the proceedings when Mr. Raftery of O'Brien, Driscoll and Raftery was substituted as counsel for plaintiff. This was accomplished by stipulation and order filed on December 1, 1960. Although definition of the issues was mentioned in earlier pre-trial conferences, nothing substantive was discussed and it was not until present counsel entered the case that the issues became the focus of attention which they are now.

The first pre-trial conference attended by present counsel for plaintiff took place on January 5, 1961. Chronologically, it was the fifteenth pre-trial conference held herein. Tentative issues were submitted by counsel for plaintiff. Plaintiff's tender is dated January 4, 1960. (This should read 1961) and has been marked as Exhibit 12A for identification. For purposes of this memorandum, it will be referred to hereafter as P–I. See Appendix.

At this conference, the question of amending the complaint was also raised. It was agreed that plaintiff would serve an amended and supplemental complaint. Counsel would then confer in an attempt to resolve any objections, and would bring to the court those problems remaining open. Resolution of the tentative issues was therefore held in abeyance until after rulings had been made on the amended and supplemental complaint which counsel was to submit. Thus, in terms of narrowing the issues, this first conference was inconclusive, although a fresher atmosphere had been introduced into the proceedings.

Various letters subsequently were exchanged between counsel relating to the amended and supplemental complaint.

The next conference took place on February 14, 1961. However, the definition of the issues was not discussed. The conference concerned itself with certain allegations made by Mr. Young in an affidavit filed in another action in this court. See Parker v. Broadcast Music, Inc., Docket No. Civ. 122–350, Southern District of New York.

The conference of February 16, 1961, disposed of the issues raised in the Young affidavit. The discussion turned to the amended complaint and it was agreed that if it were filed, it would be done *nunc pro tunc* as of January 30, 1961. Defendants' objections to the amended and supplemental complaint were put over to the next conference.

At the conference of February 20, 1961, objections to the amended complaint were heard. Plaintiff asserted that the amended complaint did not contain new matter. Defendants, by Mr. Eno, objected to the amended complaint on the general ground that it changed the claim. In a lengthy presentation, counsel compared the original and proposed amended complaints, and specified the respects in which it was claimed that the amended complaint changed the nature of the action. Although consideration of the tendered issues was to await resolution of the problems concerning the complaint, counsel referred to plaintiff's tender (P–I) to illustrate his argument that the nature of the action had been altered by the amended complaint. In concluding, counsel stated the issues arising out of the original complaint which defendants were prepared to meet (SM 807–08). The conference adjourned with plaintiff's counsel indicating his readiness to respond to the objections at the next meeting.

The next pre-trial conference was held on February 23, 1961. Plaintiff's counsel restated his desire not to change the issues as put forth in the original complaint. Accordingly, he requested leave to withdraw the proposed amended complaint. He proposed to proceed on the original complaint but asked leave to submit a retyped complaint with technical corrections reflecting the fact that ASCAP and SESAC were no longer parties, but remained as co-conspirators. Leave to file a supplemental complaint bringing matters down to date was also requested. Leave to withdraw the proposed amended complaint was granted. Although there was no objection in principle to counsel's other requests, defendants reserved comment until such time as the retyped complaint would be served upon them for examination.

On February 28, 1961, the twentieth pre-trial conference was held. Counsel for plaintiff submitted another proposed amended and supplemental complaint. Defendants were given an opportunity to study same. Counsel for Life Music then defended the issues previously tendered, (P–I). He asserted that no issues had been changed and that every issue that was in the case from its inception and every issue asserted in the brief supporting plaintiff's motion for summary judgment were included in P–I. Counsel for defendant BMI then addressed himself to plaintiff's tender (P–I). After setting forth the purpose of a definition of issues he properly noted that the issues must have their basis and origin in the charges of the complaint. Examining plaintiff's issues with particularity, counsel urged that they were improper in that they bore no relation to the complaint. Had the first proposed amended complaint been allowed, these issues would have had some bearing. I think it is clear that plaintiff's first proposed amended complaint would have changed the nature of this action. Having withdrawn that proposed amendment, plaintiff attempted to accomplish the same end through his definition of the issues. He tried to do by indirection what he had failed to achieve directly. Notwithstanding plaintiff's argument that P–I applied to the original complaint, to the first

proposed amendment, and to the second amended complaint as well, the court observed that certainly more could be accomplished on issue defining. Again, I expressed my desire to conduct these conferences on an informal basis in the hope that full discussion would encourage counsel to agree. Plaintiff's counsel, in response to a query, was of the opinion that P–I could be improved upon. He stated that the discussion had helped him to see the issues more clearly and agreed that they "have been clearly and succinctly stated." (SM 898). The conference adjourned on an optimistic note. Defendants were to tender their issues and meet with plaintiff to explore possible areas of agreement.

On or about March 7, 1961, differences again arose concerning plaintiff's second amended complaint resulting in an exchange of correspondence between counsel.

By letter dated March 17, 1961, defendants transmitted to the court a copy of their Proposed Tentative Definition of the Issues, dated March 6, 1961. This document was marked Exhibit D for identification on April 3, 1961. For purposes of this memorandum it will hereafter be referred to as D–I. See Appendix. By letter dated March 20, 1961, plaintiff transmitted to the court a copy of Tentative Issues Tendered by Plaintiff, dated March 17, 1961, and marked as Exhibit 13 for identification on April 3, 1961. For purposes of this memorandum it will hereafter be referred to as P–II. See Appendix.

By letter dated March 24, 1961, plaintiff transmitted to the court an amended and supplemental complaint. Copies were sent to defendants on the same day.

The next pre-trial conference was held on April 3, 1961. Plaintiff formally moved for leave to serve and file an amended and supplemental complaint. The motion was granted, no opposition, and the complaint was filed.

Although some discussion was had concerning the issues, counsel for plaintiff suggested that any further discussion await the service of amended answers and joining of issue. Some preliminary discussion also was held on the possibility of holding a separate trial on the issue of plaintiff's ability to enter the performance rights licensing business. The court indicated that an application for a separate trial was premature at this time. Counsel also indicated that another attempt would be made to reach agreement. The court adjourned the conference on the hopeful note that the spirit of cooperation then evident would prevail.

From copies of correspondence between counsel, it appears that plaintiff transmitted a set of tentative issues to defendants on or about April 19, 1961. A copy of that tender, dated April 19, 1961, was received by the court on May 22, 1961. For purposes of this memorandum it will be hereafter referred to as P–III. See Appendix.

On April 25, 1961, counsel conferred without the presence of the court. Pursuant to a telephone inquiry, the court consented to counsels' suggestions that memoranda be exchanged on the unresolved issues, with a pre-trial conference to follow.

On April 26, 27 and 28, 1961, the answers of defendants to the amended and supplemental complaint were filed.

On or about May 1, 1961, a dispute arose concerning the time within which defendant BMI would have to answer a set of interrogatories propounded by plaintiff. This led to an exchange of correspondence between counsel culminating in a request to the court that the time of defendant BMI to answer or otherwise address itself to the interrogatories be extended to such time as the court may fix after the issues have been determined. Defendant BMI's application was rendered moot by Mr. Raftery's letter of May 5, 1961, to Mr. Eno, wherein counsel stated that plaintiff would not expect an answer to its interrogatories until after

the court had fixed a time for such answers.

Memoranda from counsel were then submitted to the court. By letter dated May 12, 1961, plaintiff submitted its memorandum in support of its tender. By letter dated May 15, 1961, defendants submitted their memorandum on the definition of the issues. By letter dated May 19, 1961, plaintiff submitted its reply brief on the definition of the issues. By letter of May 22, 1961, defendants submitted their answering memorandum on the definition of the issues.

After studying the various memoranda submitted by the parties, a conference was held on May 25, 1961. This was, in fact, the first time that all parties came to grips with the issues with any degree of specificity. The discussion concerned P–III and D–I. To recapitulate with particularity all the arguments made at that time would be repetitious, since the transcript is available. I will note, however, some of the highlights so that the mosaic of our past efforts will be complete.

After making some general observations about certain themes which appear to run throughout this dispute over issues the court proceeded to hear argument. Defendants, by Mr. Rosenman, urged the importance of keeping in mind the nature of the industry and the temporal limits of the action. The distinction between ultimate and evidentiary facts was discussed both generally and in relation to the question of conspiracy. The question as to whether this case involves both § 1 and § 2 of the Sherman Act was also raised. The phrasing of various issues was next attempted and in the prevailing spirit of cooperation some concessions were made by each side and compromises were reached. As the discussion progressed, agreement appeared to be very close indeed. The conference ended with the understanding that counsel would meet in an attempt to draft some language to compromise the minor outstanding differences on one issue.

The expectations and hopes which the May 25th conference had raised were quickley shattered. By letter of June 2, 1961, Mr. Raftery informed the court that he was unable to come to any agreement with counsel for defendants and was submitting a new set of issues. These issues are dated June 2, 1961, and will hereafter be referred to as P–IV. See Appendix. Defendants then corresponded with the court by letter of June 7, 1961. They expressed their shock at plaintiff's submission of a new tender of issues. Defendants set forth a summary of the conference held between counsel on June 1, 1961. It was stated that agreement had been reached on some issues, and these issues were included as Annex A to the letter. The two items which were left open for consideration were included as Annex B. Defendants' letter evoked a response from Mr. Raftery on June 8, 1961, wherein counsel stated his belief that the conferences between counsel were based on a position that unless there was agreement in toto on tentative issues, there was to be no agreement at all. Counsel also indicated that plaintiff would be prepared to defend P–IV at the next conference scheduled for June 14, 1961. By letter of June 9, 1961, Mr. Rosenman responded on behalf of the defendants. They vigorously disputed the contention that the conferences between counsel were on an all or nothing basis. It was their position that the conferences were held to reach agreement to the extent possible and that unresolved issues were to be brought to the court for rulings.

By the time of the pre-trial conference of June 14, 1961, the earlier spirit of cooperation had almost completely disappeared. Nevertheless, the court made further efforts to secure an agreement on the issues by requiring discussion as to the specifics. It became apparent that plaintiff was fearful of having its discovery limited while defendants were fearful of the possibilities of unbounded discovery. Although the order of trial was not yet before the court for decision,

plaintiff expressed its opposition to separate trials on some issues. Mr. Raftery defended his submission and furnished a memorandum indicating which paragraphs of the complaint provided the bases for his tender. Further efforts were made at agreement by rephrasing and renumbering the issues in the parties' respective tenders, but to no avail. After extensive discussion, the crux of the disagreement was clearly over the conspiracy issue. (# 1 of P–IV and # 2 of D–I). The conference concluded with Mr. Raftery requesting leave to present supplemental issues based upon the complaint. The court granted plaintiff's request and set the next conference for June 28, 1961.

On June 16, 1961, Mr. Raftery submitted additional sub-paragraphs to the conspiracy issue. He reiterated his fear of being limited in discovery if he were to accept only the four subdivisions proposed in Issue # 2 of D–I. Defendants responded by letter of June 21, 1961. They reviewed what they alleged were Mr. Raftery's repudiations of prior agreements. They concluded that it would be futile to seek further agreement and stated their belief that the issues should now be framed by the court. Defendants requested, and were granted, leave to submit a memorandum supporting their views.

On September 1, 1961, defendants submitted a memorandum in opposition to plaintiff's "Draft of Amendment to Tentative Issues." On October 4, 1961, plaintiff submitted a memorandum supporting its definition of the issues. Plaintiff also submitted a complete copy of its definition of the issues which included the June 16th amendments. That document will hereafter be referred to as P–V. See Appendix. Defendants then submitted a reply memorandum on October 16, 1961.

The final communications from counsel are a letter of November 14, 1961, from Mr. Raftery calling the court's attention to Padovani v. Bruchhausen, 293 F.2d 546 (2d Cir. 1961), and a prompt November 15, 1961, reply from Mr. Rosenman in rebuttal. The case will be discussed infra.

### DEFINING THE ISSUES

Presently before the court is P–V, consisting of five major divisions. Of these, issue number 1 contains twenty-six subdivisions. P–V has been tendered by plaintiff as its most recent version of what the issues are in this case. Defendants have made but one formal tender, D–I. Based upon the pre-trial proceedings, however, D–I is no longer the accurate reflection of the position of defendants. In Defendants' Memorandum in Opposition to Plaintiff's "Draft of Amendment to Tentative Issues" Submitted Under Date of June 16, 1961, (hereinafter referred to as Defendants' Opposing Memorandum), defendants have set forth a version of the issues which they are willing to accept (pp. 3–4). The court will deal with that version as defendants' tender (D–II). See Appendix. To the extent that the respective tenders of issues, D–II and P–V are identical and correctly set forth the issue, the court will accept this concurrence as to that particular issue. However, where the respective tenders are not in accord, the court will explore the differing versions and rule accordingly.

*Issue No. 1*

The following issue is contained in both P–V and D–II in identical language. It was agreed upon originally at the pre-trial conference of April 25, 1961, and is accepted by the court.

> "Was the plaintiff, in and after February 1954, equipped to, and did it make a legitimate *bona fide* effort to enter the performance rights licensing business?"

A disagreement still persists, however, concerning whether this issue shall be stated as No. 1 or No. 2. Plaintiff urges that the issue be stated as No. 2, following the issue of conspiracy. De-

fendants, although originally contending that the issue is properly first in sequence, now are amenable to stating it as No. 2 "on the understanding that the new sequence is not controlling for trial purposes" (Defendants' Opposing Memorandum, p. 5). Based upon prior statements I take it that defendants intend to move for a separate trial of this issue. That question is not now before the court and its resolution can await the time when defendants make their motion. I do believe, however, that the question of sequence of the issues should be determined at this stage of the proceedings.

The Handbook recommends that the sequence in which the issues will be tried should be established in advance of trial. Wherever possible, it is advisable to present the evidence relating to each issue as a separate unit. HANDBOOK, 25 F.R.D. at 404–05. Thus, time of trial will be shortened and the possibility of confusing the jury lessened. Although the sequence in which the issues are defined at this stage of the proceedings need not necessarily conform to the order of proof at trial, it would seem to be a more orderly procedure to require it. Just as the order of proof should be logical and sequential, so too should the definition of the issues progress in logical sequence. And there seems little point to setting the issues forth in one sequence and then changing that order for purposes of trial.

Since the parties have not addressed their arguments to this question, they shall be provided with an opportunity to do so. The foregoing issue as framed shall be tentatively set down as No. 1. At the next pre-trial conference the court shall expect counsel to be prepared to argue the proper sequence to be adopted and shall expect these arguments to be supported by relevant authority.

*Issue No. 2*

The core of the controversy now as well as throughout these proceedings has been Issue No. 2, the issue of conspiracy and monopolization. As presently before the court, D–II sets forth a general statement of the alleged conspiracy pleaded in the complaint, together with four subdivisions, a–d, which delineate the means whereby the alleged conspiracy was effectuated. P–V sets forth the same general paragraph, (numbered, however, as issue No. 1) as well as the identical four subdivisions a–d which are contained in D–II. P–V then goes on to set forth twenty-two additional subdivisions, commencing with the letter "e" and conveniently terminating with the letter "z".

At least in so far as the general paragraph and subdivisions a–d are concerned, the identity of language employed by the parties would make it appear that they concur as to the validity of these items as issues. I, too, am persuaded as to the correctness of these items as issues. Before reaching the twenty-two subdivisions of P–V, some general discussion of the accepted issues is warranted. It should be also noted here that defendants have furnished the court with extensive memoranda which have been of material assistance in studying these problems. Plaintiff's memoranda have been vague and insubstantial. They have consistently failed to come to grips with the problems before the court. The mere listing of numbered paragraphs of the complaint following each subdivision tendered has been a bare compliance with the directions of this court. Plaintiff's memoranda have not served to advance the resolution of the issues in any appreciable degree.

As stated in D–II, Issue No. 2 reads as follows:

"Did the defendants and ASCAP and Sesac, in and after February 1954, conspire to restrain trade and commerce in, or conspire to monopolize, and monopolize (all of which, if it existed at all, may have originated prior to February 1954), the

business of licensing performance rights in musical compositions by:

"(a) Agreeing to issue only blanket licenses* to users of performance rights, and denying other types of licenses to users, with the purpose and effect of rendering users financially unable to do business with other licensors of performance rights;

"(b) Inducing licensees to refuse to do business with plaintiff;

"(c) Inducing licensees, through their ownership of stock in BMI, their receipt of rebates, discounts and services from BMI, and through the ownership of record producers, to use BMI musical compositions to the exclusion of others;

"(d) Instructing broadcasters to refrain from playing records which did not bear BMI or ASCAP markings?

---

* A "blanket license" is defined to be an authorization to a user to perform any of the compositions in the licensor's catalogue at any time during the period of the license, the amount of the license fee not being dependent upon the number or frequency of the performance of the licensed music."

Since the issues as defined and narrowed must find their origin and foundation in the complaint, a summary of the allegations contained in the amended and supplemental complaint is in order. The complaint alleges that plaintiff, a New York corporation, was a publisher of musical compositions. Prior to 1954, plaintiff had a contractual arrangement with BMI whereby it granted to BMI the public performance rights in its musical compositions and received from BMI certain stipulated payments for the performance of these musical works by BMI's licensees as part of BMI's catalogue. It is alleged that the contractual relationship was discontinued at the end of 1953. The respective answers of defendants allege that general releases were obtained from the plaintiff

at that time. The complaint goes on to allege that after the termination of the contract, plaintiff undertook to engage in the performance rights business. Plaintiff alleges that it attempted to license the performance rights of compositions in its catalogue directly to broadcasters, but was unsuccessful due to the existence of an unlawful conspiracy among defendants, ASCAP and Sesac. The complaint alleges that the conspiracy was one to monopolize the performance rights licensing business for the benefit of the conspirators and to exclude others from the market. The means by which this conspiracy operated is then set forth in the complaint.

The complaint lays great stress on the blanket license. It is alleged that the conspirators agreed to issue only blanket licenses to users of musical works to the exclusion of other types of licenses. The purpose and effect of this arrangement was to prevent users from accepting licenses from other performance rights licensors due to the onerous financial burden which the blanket licenses imposed upon them. The complaint alleges that the blanket licensing was used to create a monopoly and that it did in fact create a monopoly in the industry. Plaintiff charges that the failure of the defendants and co-conspirators to license musical works by methods other than blanket licenses prevented plaintiff from entering the performance rights licensing business and selling the performance rights to its musical works. The complaint also alleges that BMI induced and persuaded its licensees to reject and refuse the licenses offered by plaintiff. As a further subordinate means used in furtherance of the general conspiracy, the complaint alleges that the licensees of BMI were induced to give preferential and discriminatory use to BMI's music to the exclusion of competitive musical works. This inducement was accomplished, it is alleged, because the broadcaster users were stockholders and board members of BMI; because of grants by BMI of re-

bates, discounts, services and other benefits to its users; and because of the ownership by NBC and CBS of the major phonograph record producing and distributing companies. Finally, plaintiff alleges that BMI and ASCAP instructed licensees to refrain from performing any recorded musical compositions that did not bear the markings or labels of BMI or ASCAP. Thus, the complaint alleges a conspiracy to foreclose the market for performance rights licenses and alleges the means utilized by defendants and their co-conspirators to effectuate their unlawful objective.

When Issue No. 2 a–d is compared with the complaint and the court's summary stated above, it is readily apparent that it accurately reflects the material allegations of the complaint. The conspiracy among the defendants and co-conspirators is stated; the relevant period of time, February 1954 and thereafter, is defined; and the means by which the conspiracy is alleged to have been effectuated are set forth. It should also be noted at this point that the general conspiracy paragraph of Issue No. 2 differs from that originally proposed in D–I. At the conference held May 25, 1961, the language of this issue was the subject of extensive discussion. (See, e. g., SM 1032–39). Plaintiff contended that the complaint intended to charge and does charge a violation of § 1 as well as a violation of § 2 of the Sherman Act. Defendants asserted that no violation of § 1 was alleged in the complaint. This difference no longer exists because plaintiff's and defendants' respective submissions of this general paragraph both contain the language of "conspiracy, in restraint of trade." I find that Issue No. 2, containing subdivisions a–d, as set forth in D–II, is the correct definition of issues on this aspect of the case. The court will now deal with plaintiff's proposed twenty-two additional subdivisions.

Proposed subdivisions (e), (f), and (g):

"(e) By the defendants CBS and NBC owning, operating and controlling the two largest national radio broadcasting networks and television networks. (Par. 45 of complaint)

"(f) By originating radio and television programs which are broadcast over many and sometimes all of the stations in their respective networks throughout the several States of the United States. (Par. 45, 46 of complaint)

"(g) By the defendants CBS and NBC individually owning, operating and controlling, directly or indirectly, standard and FM radio broadcasting stations and television broadcasting stations throughout the United States. (Par. 47 of complaint)"

In their *Opposing Memorandum*, defendants have dealt with the above three proposed additions together. Since they involve a common subject, I shall also consider them as a unit.

One of the purposes of defining the issues is to state the real issues while eliminating false issues. See HANDBOOK, 25 F.R.D. 351, 389 (1960). The ownership and operation of stations and networks is not a real issue in this case. The complaint charges that the broadcasters used BMI music and excluded the music of others, including the music owned or controlled by plaintiff. The ownership and operation of networks and stations is significant only in that it is alleged that because of this arrangement together with the other arrangements charged, defendants were able to induce licensees to exclude the music which plaintiff sought to license. Matters concerning the ownership, operation and control of networks and stations and matters concerning the originating of radio and television programs are, at best, evidentiary. Moreover, the paragraphs of the complaint to which plaintiff has keyed these pro-

posed issues (par. 45, 46, 47,) are not even listed under the sections involving the means and methods employed to effectuate the conspiracy. They are listed under the sections headed "JURISDICTION AND VENUE."

The proposed additions (e), (f), and (g), are improper and are not acceptable to the court as part of the definitions of the issues. The matters to which these three proposals relate are encompassed within the definition of the issues already accepted. Issue 2(a)–(d).

Proposed subdivisions (h) and (i):

"(h) By the defendants RCA and CBS, directly or indirectly, through their subsidiary and affiliated organizations engaging in the manufacture and sale of phonograph records, the combined sales of which constitute a large and major portion of the total record sales of all manufacturers in the United States. (Par. 49 of complaint)

"(i) By the defendants, or some of them, owning or controlling the recordings of phonograph records which are generally used during the period hereof on radio and television as part of the use and performance of musical works and compositions. (Par. 40,44 of complaint)"

The complaint charges that BMI's music was used by licensees to the exclusion of the music of others, and that the inducement to do so stemmed, in part, from the ownership by NBC and CBS of companies which produced phonograph records. The question of ownership of record companies is thus properly stated in Issue 2(c) as one of the means by which the alleged conspiracy was accomplished. Plaintiff's formulation in (h) and (i) is improper and unacceptable. There is no issue of record company ownership *per se* without impact upon the plaintiff. And again, the paragraphs of the complaint to which the proposed issues are keyed are contained in the section on "JURISDICTION AND VENUE," and are not even related by plaintiff to the sections dealing with means and methods.

Proposed subdivisions (j), (k), and (l):

"(j) By the ownership of the capital stock of BMI, a substantial part of which was owned by either NBC or its affiliates and by CBS or its affiliates, and the balance of which stock was owned entirely by parties engaged in the broadcasting business, either radio or television. (Par. 52 of complaint)

"(k) By electing and continuing in office as officers and directors of defendant BMI who were either officers or directors or employees of defendant NBC or its affiliates, or of the defendant CBS or its duly authorized agents and representatives. (Par. 53,54 of complaint)

"(l) By the defendants, CBS and NBC participating and still participating in the operation, management and control of defendant BMI. (Par. 55,56 of complaint)"

These proposed subdivisions deal with the nature of BMI's structure. As related to the complaint, it is alleged there that BMI's music was given preferential and discriminatory treatment by licensees to the exclusion of competitive musical compositions. The broadcasters, including CBS and NBC, were induced to give these exclusionary preferences because of their stock ownership of BMI and their membership on the board of BMI. Thus, the alleged injury to plaintiff resulted from the preferences granted BMI's music, which preferences were motivated by the nature of BMI's structure. Plaintiff's attempts to challenge the legality of BMI *per se* in previous tenders of issues were unsuccessful (P–I, P–II and P–III). Its present attempt similarly cannot succeed since plaintiff can only challenge illegality which has an impact upon it. The issue with respect to stock ownership, membership on the board and participation in the operation, management and con-

trol of BMI is encompassed within Issue 2(c). Plaintiff's proposed (j), (k) and (l) are rejected.

Proposed subdivision (m):

"(m) By the defendant BMI and its co-conspirators ASCAP and Sesac owning and controlling in excess of 95% of the right to publicly perform the music performed by radio and television stations and other users throughout the United States. (Par. 57 of complaint)"

The propriety of this proposal was discussed at the conference of May 25, 1961 (SM 1035-37). Stating it in its present vague and incomprehensible form does not make it any more acceptable now than it was then. The proposal is at the very most an evidentiary matter and is not an issue. It is unacceptable.

(Defendants have stated in their *Opposing Memorandum* pp. 13–14, that this item was one which plaintiff's counsel on June 1, 1961, agreed to withdraw under a stipulation that such withdrawal was without prejudice to plaintiff's right to offer proof thereof, subject to defendant's objections on any and all grounds. Although no such formal stipulation was entered into, defendants indicate their continued willingness to accept such an agreement.)

Proposed subdivisions (n) and (o):

"(n) By a collection or aggregation of copyrights or performance rights transferred or assigned to defendant BMI and co-conspirators ASCAP and Sesac, or in any other manner acquired from their respective composer, author and publisher members and affiliates. (Par. 58 of complaint)

"(o) By providing in their agreements securing the rights referred to in the preceding paragraph, there was a provision that no further assignment thereof will be made or granted to others. (Par. 59 of complaint)"

Both subdivisions deal with the manner in which BMI, ASCAP and Sesac acquired the performance rights in their catalogues of musical works. I see no issue in this case concerning the manner in which these rights were acquired, nor has plaintiff made any attempt to illustrate the relevancy of the manner of acquisition. No mention of acquisition is made under the sections of the complaint dealing with means and methods used to effectuate the alleged conspiracy. Merely because the complaint describes, under the heading "CHARACTER AND NATURE OF THE BUSINESS INVOLVED," the manner in which performance rights are acquired by BMI, ASCAP, Sesac, and the plaintiff, does not make it a real issue. The complaint charges that plaintiff owned and controlled a catalogue of performance rights which it was unable to exploit because of the conspiracy. There is no claim that defendants conspired to prevent plaintiff's acquisition of performance rights. Nor is there a claim that the means used to acquire performance rights prevented plaintiff from licensing his catalogue to users. These proposed additions are yet another attempt to broaden rather than define the issues. It may no longer be done at this stage of the proceedings. Proposals (n) and (o) are rejected.

Proposed subdivisions (p) and (q):

"(p) By defendant BMI employing an inaccurate logging report system as a basis for payments of compensation to its licensors. (Par. 73 of complaint)

"(q) By placing restrictions in its agreements with licensors of an illegal nature, as more particularly pleaded in paragraph 75 of plaintiff's complaint, to wit, the licensor could not "be employed by, render services for, act on behalf of, advise, counsel or be associated with any person, firm or corporation whatsoever, in connection with any contractual or other relationship be-

tween BMI and such person, firm or corporation"; and, secondly, that the licensor could not "engage in any way, directly or indirectly, in efforts to promote the public performance of musical compositions, the public performance rights to which are licensed by BMI," or advise or assist any person in regard thereto as to which the public performance rights are licensed by BMI."

Subdivision (p) deals with BMI's relationships with its licensors, i. e., those composers and publishers who grant to a performance rights organization the right to license their musical works to users. I do not see how this can be considered as a real issue in this case. The complaint charges a conspiracy to prevent plaintiff's entry into the business of licensing musical works to users. It does not charge that the method whereby the performance rights were obtained and payment made was one of the means employed by defendants to carry out the conspiracy. BMI's relationships with its licensees is an issue in this case. Its relationships with its licensors is not at issue, although it may conceivably have some bearing purely as an evidentiary matter. The resolution of that question, however, can await the time when it is properly raised. Paragraph 73 of the complaint, to which this proposed issue is keyed, sets forth one of the reasons why plaintiff severed its relations with BMI when it was one of BMI's licensors. It does not allege that reason as a means of accomplishing the conspiracy charged in the complaint.

Proposed issue (q) also deals with BMI's licensors and is subject to the same infirmity as proposed issue (p). I perceive no issue in this case involving the terms of BMI's agreements with its licensors. Moreover, paragraph 75 of the complaint, to which this proposal is keyed, does not complain of any illegality in the contracts between BMI and its licensors. What paragraph 75 does set forth, however, is the substance of the agreement entered into between plaintiff and BMI when plaintiff severed its connections with BMI in 1953. Citation of paragraph 75 in support of this proposed issue is misleading. Significantly, both paragraphs 73 and 75 are contained in the complaint in the section dealing with background allegations entitled "RELATIONS BETWEEN PLAINTIFF AND DEFENDANTS."

I find proposed issues (p) and (q) improper and they are rejected.

Proposed subdivision (r):

"(r) By granting upwards of 95% of the contracts made by defendant BMI and co-conspirators ASCAP and Sesac to their respective licensees are in a blanket form, known as a blanket license agreement, as more particularly described in the definition annexed to paragraph (a) of this subdivision. (Par. 80 of complaint)"

This proposal deals with blanket licensing, an issue which is already included as Issue 2(a). Proposal (r) does nothing more than raise the question of the percentage of contracts which involved blanket licenses. This is purely an evidentiary matter but it is not an issue. Moreover, standing by itself in this form, the proposal relates to nothing that has bearing on the issues in this case. The issue concerning blanket licensing must relate to the charge that the employment of such licenses affected plaintiff by being such a financial burden upon users that they were unable to accept licenses from plaintiff.

Proposed subdivision (r) is rejected.

Proposed subdivision (s):

"(s) By issuing titles contained in the respective catalogs or repertories of defendant BMI and co-conspirators ASCAP and Sesac, claiming exclusive performance rights ownership, when, as a matter of fact, a great percentage of the catalogs was neither original nor copyrighted but belonged to and

were part of the public domain. (Par. 82 of complaint)"

This proposal attempts to make an issue out of the validity of the copyrights on the musical works in the catalogues of BMI, ASCAP, and Sesac. In keying the proposal to Paragraph 82 of the complaint, plaintiff has conveniently omitted paragraph 83 wherein reference is made to the public domain compositions contained in the respective catalogues which had been represented by BMI, ASCAP and Sesac as properly subject to copyright because they were new arrangements. But even if the proposed issue were rephrased to include the allegations of both paragraphs 82 and 83, it would still be improper. The proposal is not related to any impact upon the plaintiff. Furthermore, this lawsuit was not brought to try the validity of the copyrights on the musical works in the respective catalogues, and I do not propose to permit plaintiff to metamorphose this lawsuit.

Proposed subdivision (s) is rejected.

Proposed subdivision (t):

"(t) By indicating on the phonograph records that the particular composition is in either the defendant BMI's catalog or ASCAP's catalog and, to a lesser degree, Sesac's catalog, knowing that if said record does not contain such label or marking, the broadcaster will not perform or use the composition. (Par. 89, 90 of complaint)"

The proper formulation of this issue is contained in Issue 2(d) and is based on paragraph 124 of the complaint. To the extent that proposed issue (t) purports to be something more than repetitive of Issue 2(d) it is improper, and is rejected.

Proposed subdivision (u):

"(u) By the defendant BMI furnishing without cost or expense to its licensees a variety of goods and services distinct, separate and apart from its functions as a performance rights organization, with the intent and purpose of increasing the use of BMI's music, and in many instances to the exclusion of unaffiliated authors, composers and publishers. (Par. 92, 93 of complaint)"

This proposal is covered in Issue 2(c). Plaintiff has failed to demonstrate that this proposal differs in any material respect from Issue 2(c).

Proposed addition (u) is rejected.

Proposed subdivision (v):

"(v) By the defendant BMI engaging in the business of publishing musical compositions so that they may be advanced and exploited by BMI with its licensees at the expense and to the exclusion of other compositions. (Par. 94, 95 of complaint)"

This proposal attempts to set up as a separate issue the activities of BMI as a music publisher. Paragraphs 94 and 95 of the complaint, to which this proposal is keyed, allege that BMI publishes musical compositions and that these compositions are "exploited by BMI with its licensees at the expense and to the exclusion of other compositions." The issue of whether BMI engaged in the publishing business in order that the compositions published by it could be exploited to the exclusion of compositions published by others is not an appropriate issue. The real issue in the case is whether BMI's catalogue of performance rights was given exclusionary preference as a means of bringing about the conspiracy. As I have pointed out in discussing proposed subdivisions (n) and (o), there is no issue concerning the manner in which performance rights were acquired. The issue of whether BMI's catalogue was given exclusionary preference is covered in Issue 2(c).

Proposed subdivision (v) is rejected.

Proposed subdivision (w):

"(w) By the exclusive ownership of the capital stock of defendant BMI by approximately seven hun-

dred radio broadcasting stations and the major television networks or television stations, all of which are licensees of said defendant BMI as well as licensees of ASCAP and Sesac. (Par. 114, 115 of complaint)"

Although plaintiff has keyed this proposal to two different sections of the complaint, the substance of it is similar to proposed subdivision (j). The discussion there is also applicable here. The question of stock ownership of BMI is contained in Issue 2(c).

Proposed subdivision (w) is rejected.

Proposed subdivision (x):

"(x) By the defendant BMI, as a gratuitous and extra-corporate service, grants rebates and discounts to its licensees and also maintains and operates clinics, programming services and other such services and benefits for its said licensees, thus causing the licensees of defendant BMI to give preferential and discriminatory use to BMI's musical works and compositions to the exclusion, damage and detriment of competitive musical creations. (Par. 116, 117 of complaint)"

The question of rebates and discounts as well as services (see proposal (u)) is contained in Issue 2(c). The purpose of defining issues is to narrow and sharpen the areas of dispute. Repetition and redundancy do not contribute to that aim.

Proposed subdivision (x) is rejected.

Proposed subdivision (y):

"(y) By the defendants NBC and CBS, through their ownership and control of radio and television broadcasting stations, radio and television broadcasting networks, and htrough their ownership and control of the major record producing and distributing companies, thus exercise control over a major segment of the supply and performance of music in the United States of America; and,

further, in conjunction with the ownership of stock by defendants NBC and CBS in defendant BMI, directly or indirectly, and their ownership on the board of directors of BMI, effectively operate to dictate the use of BMI musical works and compositions to licensees of BMI to the exclusion of competitive works. (Par. 122, 123 of complaint)"

This proposal is similarly repetitive of the substance of proposals (e) through (l). What was said there is applicable here.

Proposed issue (y) is rejected.

Proposed subdivision (z):

"(z) By the defendant BMI and ASCAP instructing and inducing radio and television broadcasting stations to refrain from performing any recorded musical compositions that do not bear the BMI or ASCAP label or marking. (Par. 124 of complaint)"

Issue 2(d) covers the substance of this proposal, which is rejected.

*Issue No. 3:*

Although presently the subject of controversy, this issue was, at one time, agreed upon by all counsel (SM 1108–09, 1134). The form in which Issue No. 3 was agreed upon is set forth in D–II as follows:

"Did the defendants and ASCAP and Sesac, in and after February 1954, by reason of the foregoing, proximately prevent plaintiff from entering the performance rights licensing business?"

Plaintiff now proposes that Issue No. 3 be stated in the following language:

"By reason and as a direct and proximate result of all the foregoing acts and practices of the defendants and ASCAP and Sesac, as aforesaid, plaintiff has been prevented from entering into the public performance rights business and has been foreclosed, obstructed ,and denied the right to compete in a free

and open market. (Par. 128 of complaint)"

In none of its previous tenders of issues has plaintiff stated this issue in the terms it now proposes. With the exception of referring to paragraph 128 of the complaint, plaintiff has made no attempt to justify this departure. Moreover, nowhere in the pre-trial conferences or in its memoranda has plaintiff set forth any specific argument in support of the form it now urges.

Paragraph 128 of the complaint charges that "the introduction to the public of the plaintiff's musical works and compositions has been foreclosed, obstructed, denied and wholly prevented." The "right to compete in a free and open market," whatever that may mean, is not stated therein. But what is even more significant, the substance of Issue No. 3 is not to be derived from one isolated paragraph plucked from a prolix complaint. It is to be gleaned and distilled from the entire section of the complaint entitled "DIRECT AND PROXIMATE EFFECT OF DEFENDANTS AND THEIR CO-CONSPIRATORS ASCAP'S AND SESAC'S ACTS AND PRACTICES ON PLAINTIFF AND OTHERS" (Paragraphs 125–131). A reading of these sections in conjunction with all the discussions, conferences and arguments had heretofore makes it abundantly clear that the real issue here is the alleged effect of the conspiracy and monopolization described in Issue No. 2 in preventing plaintiff's entry into the performance rights licensing business. Plaintiff's formulation of Issue No. 3 serves only to inject ambiguity into the proceedings. The purpose of issue defining is to pare the prolixity and excess verbiage to which antitrust complaints are prone in order to crystallize the real issues in the case. The use of meaningless and ambiguous language serves to obfuscate and confuse, not to define and clarify. Plaintiff's proposed formulation is unacceptable on the further grounds that

it ignores the temporal significance of February 1954 and that it is stated not as an issue to be determined but as a conclusion.

Issue No. 3 will be stated as set forth in D–II.

*Issue No. 4:*

There is no controversy as to Issue No. 4. P–V and D–II define the issue in identical language as follows:

"Did the plaintiff sustain direct pecuniary damage to its business or property by virtue thereof?"

The court accepts this formulation of Issue No. 4.

*Issue No. 5:*

Similarly, Issue No. 5 presents no problem. P–V and D–II concur in its formulation as follows:

"What was the amount of such damage?"

The court accepts this formulation.

As mentioned earlier, plaintiff has made but a meager attempt to support its proposals. Plaintiff's submissions have sought generally to broaden the issues rather than to narrow and define them. To all intents and purposes, plaintiff has done nothing more than submit an ungrammatical, fragmented version of the complaint, rather than a definition of issues. Moreover, the proposed subdivisions (e)–(z) to Issue No. 2 have been, on the whole, neither articulate nor syntactical.

█ In support of its tender, plaintiff has submitted a memorandum which seeks to justify its position in only the most superficial terms. No specific demonstration of the propriety of any of plaintiff's proposals is contained therein, nor is there any attempt made to refute defendants' contentions. Plaintiff in fact admits that its proposals are evidentiary. It also characterizes Issue 2 (a)–(d) as evidentiary. Plaintiff, in so doing, has failed to come to grips with the distinctions between evidentiary and ultimate issues for purposes of defining

the issues. I suppose one could say that everything is evidentiary and that the only ultimate issue is whether the verdict should be for plaintiff or for defendants. To state the problem in these terms, however, ignores all the arduous hours which the courts, commentators and judicial conferences have spent in attempting to make protracted cases more manageable. See pp. 2–14, supra. Plaintiff's concern that its discovery will be limited cannot be permitted to frustrate the progress of this litigation. Discovery will not be curtailed when addressed to the real issues in the case. It will, however, be limited when it seeks to go beyond the bounds of the material issues in controversy. The definition of the issues which the court has accepted, fully and fairly deals with the controversy before the court. No genuine issue has been eliminated.

The court is familiar with the authorities cited by plaintiff in its memorandum and in its letter to the court dated November 14, 1961. The article cited, Clark, Special Pleading in the "Big Case", 21 F.R.D. 45 (1957) is but one expression in the continuing dialogue between Judge Clark and Judge Dawson on the role of pleadings in protracted cases. See also Padovani v. Bruchhausen, 293 F.2d 546 (2d Cir. 1961); Nagler v. Admiral Corp., 248 F.2d 319 (2d Cir. 1957); Dawson, The Place of the Pleading in a Proper Definition of the Issues in the "Big Case", STANFORD SEMINAR, 23 F.R.D. at 430 (1958); Clark, Comment on Judge Dawson's Paper on the Place of the Pleading in a Proper Definition of the Issues in the "Big Case", STANFORD SEMINAR, 23 F.R.D. 435 (1958). The question there involves the degree of specificity to be required in pleadings. Judge Dawson would give to the pleadings a greater role in determining the issues by requiring repleading to eliminate verbosity and to delineate the issues more clearly. Judge Clark is concerned with premature dismissals due to lack of specificity in complaints. He urges greater use of the discovery procedures to bring out the evidentiary details. Neither position can sustain plaintiff's refusal to come to grips with the need to define the issues herein.

Similarly, Padovani v. Bruchhausen, supra, is no support for plaintiff's tender of the issues, nor does it constrain the court to accede to plaintiff's theory that whatever it tenders as issues must be accepted. Padovani, an action for negligence and breach of warranty, did not address itself specifically to issue formulation. There the Court of Appeals vacated a preclusion order entered by the district court after plaintiff's failure to file a satisfactory pre-trial statement. That order was so sweeping in scope that judgment for defendant would have been the only outcome possible. It would appear that the Court held no more than that the preclusion order was too broad under the circumstances. The majority went on to disapprove of pre-pre-trial special pleading which bound the parties before a hearing or conference was had and compared the procedures below with that under the old special pleading rules. This statement of the Padovani case makes it crystal clear that it is different from the case at bar. Ours is not a situation where the court is "clubbing the parties into admissions they do not willingly make * * *." 293 F.2d at 548. Nor is this an instance where the court is requiring "successive repleadings to force a plaintiff against his will to limit his case beyond the issues he has tendered in his complaint * * *." 293 F.2d at 550. It should be noted further that the Court of Appeals approved the use of pre-trial conferences in an effort to shorten lengthy trials. I need not reiterate again the numerous conferences held herein in an effort to arrive at a definition of the issues. And the Court did not "hold that a district judge may not request a pre-trial memorandum or statement from a party to assist him in formulating a pre-trial order showing the admissions and concessions of the

parties and the issues remaining to be tried." 293 F.2d at 550. The issues as defined here are drawn from the complaint and no genuine issue there pleaded has been omitted. To permit the issues to be formulated as tendered by plaintiff would in fact result in a broadening of the issues alleged in its complaint. This court is merely attempting to define the relevant issues as pleaded in order to guide the future course of this case. To accept plaintiff's approach that each side tenders the issues it intends to raise at trial without recognizing the authority of the court to rule as to the propriety of those issues would make a farce of the recommended procedures for protracted cases and flies in the face of the recommendation that the court exercise firm control of protracted litigation. HANDBOOK, 25 F.R.D. at 383–385.

In summary then, the tentative definition of the issues will be in conformity with D–II as outlined above. The foregoing memorandum shall be deemed to constitute the pre-trial order setting forth the tentative definition of the issues. It is SO ORDERED. No settlement necessary.

### APPENDIX
*P–I, dated January 4, 196[1]:*

#### TENTATIVE ISSUES TENDERED BY PLAINTIFF

Pursuant to the request of Hon. David N. Edelstein at pre-trial herein, the plaintiff through its attorneys, O'Brien, Driscoll & Raftery, sets forth the following issues:[1]

(a) Plaintiff asserts that the formation, organizational structure and subsequent operations and relationships within the music and broadcasting industries of defendant Broadcast Music, Inc., by its promoters, stockholders, affiliates, directors and officers are illegal per se

and constitute a conspiracy and/or monopoly in violation of Section 1 of the Sherman Act and other pertinent provisions of the Sherman and Clayton Acts.

In furtherance of this general illegal conspiracy and monopoly, the following overt manifestations have damaged the plaintiff in its business or property:

I. Horizontal relationship of the users of music including, among others, the defendants National Broadcasting Company, Inc. and Columbia Broadcasting System, Inc., as stockholders and affiliates of defendant Broadcast Music, Inc., within and through Broadcast Music, Inc., to restrain, monopolize and control interstate commerce in the public performance of music for profit in the music and television broadcasting industries.

II. Vertical relationship of the users of music including, among others, the defendants National Broadcasting Company, Inc., and Columbia Broadcasting System, Inc., as stockholders and affiliates of defendant Broadcast Music, Inc. with the suppliers of music, among others, defendants Columbia Records, Inc., Columbia Music Publishing Company, Master Records, Inc. and Okeh Music Publishing Company, and divers and sundry other parties within and through Broadcast Music, Inc., and its other stockholders and affiliates, to restrain, monopolize and control interstate commerce in the public performance of music for profit within the music and television broadcasting industries.

III. Horizontal relationship of the licensor suppliers of music, songwriters, publishers and record companies within Broadcast Music, Inc., to restrain, monopolize and control interstate commerce in the public performance of music for profit within the music and television broadcasting industries.

---

[1]. Inasmuch as this formulation precedes the commencement of plaintiff's discovery, this submission is without prejudice to plaintiff's right of amendment and/or supplementation pursuant to the provisions of the Federal Rules of Civil Procedure and/or the rules of this Court.

Among the ways in which the defendants and their other co-conspirators, acting in concert with defendant Broadcast Music, Inc., have affected the plaintiff and the music and television broadcasting industries, are the following:

1. Blanket Broadcast Music, Inc. license granted by Broadcast Music, Inc. to its stockholders and affiliates and licensees.

2. Pooling of individual copyrights within Broadcast Music, Inc.

3. Fixing of prices within and through Broadcast Music, Inc.

4. Broadcast Music, Inc. rebates to broadcaster licensees.

5. Broadcast Music, Inc. discriminatory services to broadcaster licensees.

6. Favored treatment of Broadcast Music, Inc. by defendants National Broadcasting Company, Inc. and Columbia Broadcasting System, Inc., and other stockholders or affiliates of Broadcast Music, Inc.

7. Broadcast Music, Inc.'s subsidies and/or guarantees to music publishers, performers, disk jockeys and others.

8. Other practices not precisely known to plaintiff at this time but which plaintiff will seek to ascertain and ultimately prove upon the trial hereof.

(b) Plaintiff asserts that the formation, organizational structure and subsequent operations and relationships of defendant Broadcast Music, Inc., within the music and television broadcasting industries, constitute a violation of Section 7 of the Clayton Anti-trust Act (Title 15 U.S.C.A. § 18).

The said formation, organization and operation of Broadcast Music, Inc. has substantially affected competition, and/or tended to create a monopoly to the detriment and damage of plaintiff and others.

(c) Plaintiff's damage period runs from December 23, 1953 to January 1956. Plaintiff has continued to incur loss and damage since the commencement of this action to date, which period will be covered in a supplemental complaint.

## CONCLUSION

That as a result of the illegal acts stated, as aforesaid, plaintiff has been directly damaged in its business and property, the amount of said damage to be fixed by a jury.

Dated, January 4, 1960

*P–II, dated March 17, 1961:*

## TENTATIVE ISSUES TENDERED BY PLAINTIFF

Pursuant to the request of Hon. David N. Edelstein at pre-trial herein, and in lieu of the issues tentatively tendered heretofore on January 5, 1961, the plaintiff through its attorneys, O'Brien, Driscoll & Raftery, sets forth the following issues: [2]

1. Prior to January 1, 1954, did the defendant Broadcast Music, Inc. and its co-conspirators, American Society of Composers, Authors & Publishers and Sesac, Inc., combine and conspire so as to virtually monopolize the musical performance rights business in the United States of America, that is, the business of selling and offering for sale to radio and television broadcasting stations and other users throughout the several States of the United States, the non-exclusive performance rights to original and alleged original musical works and compositions?

2. After January 1, 1954 and continuing up to and through the period of the amended and supplemental complaint of the plaintiff herein, did the defendant Broadcast Music, Inc. and its co-conspirators, American Society of Composers, Authors & Publishers and Sesac,

---

**2.** Inasmuch as this formulation precedes the commencement of plaintiff's discovery, this submission is without prejudice to plaintiff's right of amendment and/or supplementation pursuant to the provisions of the Federal Rules of Civil Procedure and/or the rules of this Court.

Inc., combine and conspire so as to virtually monopolize the musical performance rights business in the United States of America, that is, the business of selling and offering for sale to radio and television broadcasting stations and other users throughout the several States of the United States the non-exclusive performance rights to original and alleged original musical works and compositions?

3. Was the formation, organizational structure and subsequent operations and relationships within the music and broadcasting industries of defendant Broadcast Music, Inc., by its promoters, stockholders, affiliates, directors and officers illegal per se and constitute a conspiracy and/or monopoly in violation of Sections 1 and 2 of the Sherman Act and other pertinent provisions of the Sherman and Clayton Acts?

4. Did the horizontal relationship of the users of music including, among others, the defendants National Broadcasting Company, Inc. and Columbia Broadcasting System, Inc., as stockholders and affiliates of defendant Broadcast Music, Inc., within and through Broadcast Music, Inc., constitute a restraint, monopoly or control of interstate commerce in the public performance of music for profit in the music and television broadcasting industries?

5. Did the vertical relationship of the users of music including, among others, the defendants National Broadcasting Company, Inc. and Columbia Broadcasting System, Inc., as stockholders and affiliates of defendant Broadcast Music, Inc. with the suppliers of music, among others, Columbia Records, Inc., Columbia Music Publishing Company, Master Records, Inc. and Okeh Music Publishing Company, and divers and sundry other parties within and through Broadcast Music, Inc., and its other stockholders and affiliates, combine and conspire to restrain, monopolize or control interstate commerce in the public performance of music for profit within the music

and television broadcasting industries both prior to and after January 1, 1954?

6. Did the horizontal relationship of the licensor suppliers of music, songwriters, publishers and record companies within Broadcast Music, Inc. and within the co-conspirators American Society of Composers, Authors & Publishers and Sesac, Inc., virtually restrain, monopolize or control interstate commerce in the public performance of music for profit in the music and television broadcasting industries?

7. Did the blanket licenses granted by defendant Broadcast Music, Inc. and its co-conspirators, American Society of Composers, Authors & Publishers and Sesac, Inc., to the stockholders and affiliates of Broadcast Music, Inc. and the licensees of the co-conspirators, virtually restrain, monopolize or control interstate commerce in the public performance of music for profit within the music and television broadcasting industries, in violation of Acts I and II of the Sherman Act and other pertinent provisions of the Sherman and Clayton Acts?

8. Did the following acts of defendant Broadcast Music, Inc. and its co-conspirators, American Society of Composers, Authors & Publishers and Sesac, Inc., violate the pertinent provisions of the Sherman and Clayton Acts and restrain, monopolize and control interstate commerce in the public performance of music for profit in the music and television broadcasting industries, both before and after January 1, 1954:

a) Pooling of individual copyrights.

b) Fixing of prices within and through Broadcast Music, Inc., and its co-conspirators, American Society of Composers, Authors & Publishers and Sesac, Inc.

c) Rebates by Broadcast Music, Inc. to its stockholders and broadcaster licensees.

d) Discriminatory services by Broadcast Music, Inc. to its stockholders and licensees.

e) Discriminatory or favored treatment by and to Broadcast Music, Inc., and by and to defendants National Broadcasting Company, Inc. and Columbia Broadcasting System, Inc. and other stockholders, officers or directors or affiliates of Broadcast Music, Inc.

f) Subsidies and/or guarantees paid or given by defendants Broadcast Music, Inc., National Broadcasting Company, Inc. and Columbia Broadcasting System, Inc. to music publishers, performers, disk jockeys and others.

9. Did the formation, organizational structure and subsequent operations and relationships of defendant Broadcast Music, Inc., within the music and television broadcasting industries, constitute a violation of Section 7 of the Clayton Anti-trust Act (Title 15 U.S.C.A. § 18) or of any of the other provisions of either the Sherman Act or the Clayton Act?

10. Did the formation, organization and operation of Broadcast Music, Inc., as well as the actions of its co-conspirators American Society of Composers, Authors & Publishers and Sesac, Inc., substantially affect interstate commerce and/or tend to create a monopoly to the detriment and damage of the public and of the plaintiff?

11. Did the defendants combine and conspire to restrain any trade under Section 1 of the Sherman Anti-trust Act or to monopolize or maintain a monopoly under Section 2 of the Sherman Anti-trust Act, all in violation of said Act?

12. As result of the illegal acts heretofore stated, was the plaintiff prevented from entering into the performance rights business, as heretofore defined, either in whole or in part and, as a result thereof, has been damaged in its business or property?

13. The amount of said damage to be fixed by a jury.

Dated, March 17, 1961.

*P–III, dated April 19, 1961:*

## TENTATIVE ISSUES TENDERED BY PLAINTIFF

Pursuant to the request of Hon. David N. Edelstein at pre-trial herein, and in lieu of the issues tentatively tendered heretofore, the plaintiff through its attorneys, O'BRIEN, DRISCOLL & RAFTERY, sets forth the following issues:[3]

1. Did the defendants and the co-conspirators ASCAP and SESAC combine to restrain trade and commerce among the several States and between the several States of the United States, and to establish a monopoly in the production, acquisition, distribution, sale, use and utilization of the so-called public performance rights of musical works and compositions from January 1, 1940 to January 31, 1961?

2. Did the defendant Broadcast Music, Inc. and its co-conspirator ASCAP own, control or license in excess of 90% of the public performance rights of music performed by radio, television and other users in the United States of America?

3. Were such rights secured by defendant Broadcast Music, Inc. and its co-conspirator ASCAP through a collection or aggregation of public performance rights which were transferred to them by third parties owning or controlling such public performance rights?

4. Did the defendant Broadcast Music, Inc. and its co-conspirator ASCAP, as part of their conspiracy to monopolize the business of licensing public performance rights in musical compositions, issue so-called "blanket" licenses to virtually the entire radio and television industry on approximately 95% of the

---

3. Inasmuch as this formulation precedes the commencement of plaintiff's discovery, this submission is without prejudice to plaintiff's right of amendment and/or supplementation pursuant to the provisions of the Federal Rules of Civil Procedure and/or the rules of this Court.

musical compositions available for said purpose from February 1954 to January 31, 1961?

5. Did the control of the public performance rights, as aforesaid, tend to suppress or stifle competition or create a monopoly or tend to exclude the public, including the plaintiff herein, from entering into the business of licensing public performances of music in the United States of America from February 1954 to January 31, 1961?

6. Was the formation, organizational structure and subsequent operations and relationships within the music and broadcasting industries of defendant Broadcast Music, Inc., by its promoters, stockholders, affiliates, directors and officers illegal per se and constitute a conspiracy and/or monopoly in violation of Sections 1 and 2 of the Sherman Act and other pertinent provisions of the Sherman and Clayton Acts?

7. Did the horizontal relationship of the users of music including, among others, the defendants National Broadcasting Company, Inc. and Columbia Broadcasting System, Inc., as stockholders, affiliates and licensees of defendant Broadcast Music, Inc., within and through Broadcast Music, Inc., constitute a restraint, monopoly or control of interstate commerce in the public performance of music for profit in the music and television broadcasting industries?

8. Did the vertical relationship of the users of music including, among others, the defendants National Broadcasting Company, Inc. and Columbia Broadcasting System, Inc., as stockholders, affiliates and licensees of defendant Broadcast Music, Inc. with the suppliers of music, among others, Columbia Records, Inc., Columbia Music Publishing Company, Master Records, Inc. and Okeh Music Publishing Company, and divers and sundry other parties within and through Broadcast Music, Inc., and its other stockholders and affiliates, combine and conspire to restrain, monopolize or control interstate commerce in the public performance of music for profit within the music and television broadcasting industries both prior to and after January 1, 1954?

9. Did the horizontal relationship of the licensor suppliers of music, songwriters, publishers and record companies within Broadcast Music, Inc. and within the co-conspirators American Society of Composers, Authors & Publishers and Sesac, Inc., virtually restrain, monopolize or control interstate commerce in the public performance of music for profit in the music and television broadcasting industries?

10. Did the following acts of defendant Broadcast Music, Inc. and its co-conspirators, American Society of Composers, Authors & Publishers and Sesac, Inc., violate the pertinent provisions of the Sherman and Clayton Acts and restrain, monopolize and control interstate commerce in the public performance of music for profit in the music and television broadcasting industries, both before and after January 1, 1954:

a) Pooling of individual copyrights.

b) Fixing of prices within and through Broadcast Music, Inc. and its co-conspirators, American Society of Composers, Authors & Publishers and Sesac, Inc.

c) Rebates by Broadcast Music, Inc. to its stockholders and broadcaster licensees.

d) Discriminatory services by Broadcast Music, Inc. to its stockholders and licensees.

e) Discriminatory or favored treatment by and to Broadcast Music, Inc., and by and to defendants National Broadcasting Company, Inc. and Columbia Broadcasting System, Inc. and other stockholders, officers or directors or affiliates of Broadcast Music, Inc.

f) Subsidies and/or guarantees paid or given by defendants Broadcast Music, Inc., National Broadcasting Company, Inc. and Columbia Broadcasting System,

Inc. to music publishers, performers, disk jockeys and others.

11. Did the plaintiff in and after February 1954 make a legitimate bona fide effort to enter into the performance rights licensing business?

12. As result of the illegal acts heretofore stated, was the plaintiff prevented from entering into the performance rights licensing business, either in whole or in part, and, as a result thereof, has been damaged in its business or property?

13. If so, what was the amount of such damage?

14. The amount of said damage to be fixed by a jury.

Dated, April 18, 1961.

*P–IV, dated June 2, 1961:*

### PLAINTIFF'S PROPOSED TENTATIVE DEFINITION OF THE ISSUES

1. Did the defendants and ASCAP and Sesac prior to and in and after February 1954 conspire to restrain trade and commerce in the business of licensing performance rights in musical compositions, and to establish a monopoly or conspire to monopolize the business of licensing performance rights in musical compositions, all in violation of Sections 1 and 2 of the Sherman Act?

2. Did the defendants and ASCAP and Sesac in and after February 1954, by reason of the foregoing, prevent the plaintiff from entering into the performance rights licensing business?

3. Was the plaintiff damaged as the result of the foregoing?

4. What was the amount of such damage?

Dated: New York, New York
June 2, 1961.

---

4. A "blanket license" is defined to be an authorization to a user to perform any of the compositions in the licensor's catalogue at any time during the period of

*P–V, dated June 16, 1961:*

### PLAINTIFF'S PROPOSED TENTATIVE DEFINITION OF THE ISSUES

I. Did the defendants and ASCAP and Sesac in and after February 1954 conspire to restrain trade and commerce in, or conspire to monopolize, and monopolize (all of which, if it existed at all, may have originated prior to February 1954), the business of licensing performance rights in musical compositions by:

(a) Agreeing to issue only blanket licenses [4] to users of performance rights, and denying other types of licenses to users, with the purpose and effect of rendering users financially unable to do business with other licensors of performance rights;

(b) Inducing licensees to refuse to do business with plaintiff;

(c) Inducing licensees, through their ownership of stock in BMI, their receipt of rebates, discounts and services from BMI, and through the ownership of record producers, to use BMI musical compositions to the exclusion of others;

(d) Instructing broadcasters to refrain from playing records which did not bear BMI or ASCAP markings?

(e) By the defendants CBS and NBC owning, controlling and operating the two largest national radio broadcasting networks and television networks. (Par. 45 of complaint)

(f) By originating radio and television programs which are broadcast over many and sometimes all of the stations in their respective networks throughout the several States of the United States. (Par. 45,46 of complaint)

(g) By the defendants CBS and NBC individually owning, operating and controlling, directly or indirectly, standard

the license, the amount of the license fee not being dependent upon the number or frequency of the performances of the licensed music.

and FM radio broadcasting stations and television broadcasting stations throughout the United States. (Par. 47 of complaint)

(h) By the defendants RCA and CBS, directly or indirectly, through their subsidiary and affiliated organizations engaging in the manufacture and sale of phonograph records, the combined sales of which constitute a large and major portion of the total record sales of all manufacturers in the United States. (Par. 49 of complaint)

(i) By the defendants, or some of them, owning or controlling the recordings of phonograph records which are generally used during the period hereof on radio and television as part of the use and performance of musical works and compositions. (Par. 40, 44 of complaint)

(j) By the ownership of the capital stock of BMI, a substantial part of which was owned by either NBC or its affiliates and by CBS or its affiliates, and the balance of which stock was owned entirely by parties engaged in the broadcasting business, either radio or television. (Par. 52 of complaint)

(k) By electing and continuing in office as officers and directors of defendant BMI who were either officers or directors or employees of defendant NBC or its affiliates, or of the defendant CBS or its duly authorized agents and representatives. (Par. 53, 54 of complaint)

(*l*) By the defendants CBS and NBC participating and still participating in the operation, management and control of defendant BMI. (Par. 55, 56 of complaint)

(m) By the defendant BMI and its co-conspirators ASCAP and Sesac owning and controlling in excess of 95% of the right to publicly perform the music performed by radio and television stations and other users throughout the United States. (Par. 57 of complaint)

(n) By a collection or aggregation of copyrights or performance rights transferred or assigned to defendant BMI and co-conspirators ASCAP and Sesac, or in any other manner acquired from their respective composer, author or publisher members and affiliates. (Par. 58 of complaint)

(o) By providing in their agreements securing the rights referred to in the preceding paragraph, there was a provision that no further assignment thereof will be made or granted to others. (Par. 59 of complaint)

(p) By defendant BMI employing an inaccurate logging report system as a basis for payments of compensation to its licensors. (Par. 73 of complaint)

(q) By placing restrictions in its agreements with licensors of an illegal nature, as more particularly pleaded in paragraph 75 of plaintiff's complaint, to wit, the licensor could not "be employed by, render services for, act on behalf of, advise, counsel or be associated with, any person, firm or corporation whatsoever, in connection with any contractual or other relationship between BMI and such person, firm or corporation"; and, secondly, that the licensor could not "engage in any way, directly or indirectly, in efforts to promote the public performance of musical compositions, the public performance rights to which are licensed by BMI," or advise or assist any person in regard thereto as to which the public performance rights are licensed by BMI.

(r) By granting upwards of 95% of the contracts made by defendant BMI and co-conspirators ASCAP and Sesac to their respective licensees are in a blanket form, known as a blanket license agreement, as more particularly described in the definition annexed to paragraph (a) of this subdivision. (Par. 80 of complaint)

(s) By issuing titles contained in the respective catalogs or repertories of defendant BMI and co-conspirators ASCAP and Sesac, claiming exclusive per-

formance rights ownership, when, as a matter of fact, a great percentage of the catalogs was neither original nor copyrighted but belonged to and were part of the public domain. (Par. 82 of complaint)

(t) By indicating on the phonograph records that the particular composition is in either the defendant BMI's catalog or ASCAP's catalog and, to a lesser degree, Sesac's catalog, knowing that if said record does not contain such label or marking, the broadcaster will not perform or use the composition. (Par. 89, 90 of complaint)

(u) By the defendant BMI furnishing without cost or expense to its licensees a variety of goods and services distinct, separate and apart from its functions as a performance rights organization, with the intent and purpose of increasing the use of BMI's music, and in many instances to the exclusion of unaffiliated authors, composers and publishers. (Par. 92, 93 of complaint)

(v) By the defendant BMI engaging in the business of publishing musical compositions so that they may be advanced and exploited by BMI with its licensees at the expense and to the exclusion of other compositions. (Par. 94, 95 of complaint)

(w) By the exclusive ownership of the capital stock of defendant BMI by approximately seven hundred radio broadcasting stations and the major television networks or television stations, all of which are licensees of said defendant BMI as well as licensees of ASCAP and Sesac. (Par. 114, 115 of complaint)

(x) By the defendant BMI, as a gratuitous and extra-corporate service, grants rebates and discounts to its licensees and also maintains and operates clinics, programming services and other such services and benefits for its said licensees, thus causing the licensees of defendant BMI to give preferential and discriminatory use to BMI's musical works and compositions to the exclusion,

damage and detriment of competitive musical creations. (Par. 116, 117 of complaint)

(y) By the defendants NBC and CBS, through their ownership and control of radio and television broadcasting stations, radio and television broadcasting networks, and through their ownership and control of the major record producing and distributing companies, thus exercise control over a major segment of the supply and performance of music in the United States of America; and, further, in conjunction with the ownership of stock by defendants NBC and CBS in defendant BMI, directly or indirectly, and their ownership on the board of directors of BMI, effectively operate to dictate the use of BMI musical works and compositions to licensees of BMI to the exclusion of competitive works. (Par. 122, 123 of complaint)

(z) By the defendant BMI and ASCAP instructing and inducing radio and television broadcasting stations to refrain from performing any recorded musical compositions that do not bear the BMI or ASCAP label or marking. (Par. 124 of complaint)

II. Was the plaintiff, in and after February 1954, equipped to, and did it make a legitimate *bona fide* effort to, enter the performance rights licensing business?

III. By reason and as a direct and proximate result of all of the foregoing acts and practices of the defendants and ASCAP and Sesac, as aforesaid, plaintiff has been prevented from entering into the public performance rights business and has been foreclosed, obstructed and denied the right to compete in a free and open market. (Par. 128 of complaint)

IV. Did the plaintiff sustain direct pecuniary damage to its business or property by virtue thereof?

V. What was the amount of such damage?

Dated: New York, New York
June 16, 1961

*D–I, dated March 6, 1961:*

### DEFENDANTS' PROPOSED TENTATIVE DEFINITION OF THE ISSUES

1. Was the plaintiff, in and after February 1954, equipped to, and did it make a legitimate *bona fide* effort to, enter the performance rights licensing business?

If the answer to issue 1 is "yes",

2. Did the defendants and ASCAP and Sesac, in and after February 1954, conspire to monopolize, and monopolize, the business of licensing performance rights in musical compositions by:

(a) Agreeing to issue only blanket licenses to users of performance rights, and denying other types of licenses to users, with the purpose and effect of rendering users financially unable to do business with other licensors of performing rights;

(b) Inducing licensees to refuse to do business with plaintiff;

(c) Inducing licensees, through their ownership of stock in BMI, their receipt of rebates, discounts and services from BMI, and through the ownership of record producers, to use BMI musical compositions to the exclusion of others;

(d) Instructing broadcasters to refrain from playing records which did not bear BMI or ASCAP markings?

If the answer to issue 2 is "yes",

3. Did the defendants and ASCAP and Sesac, in and after February 1954 by reason of the foregoing, proximately prevent plaintiff from entering the performance rights licensing business?

If the answer to issue 3 is "yes",

4. Did the plaintiff sustain direct pecuniary damage by virtue thereof?

If the answer to issue 4 is "yes",

5. What was the amount of such damage?

Dated: New York, New York
March 6, 1961.

*D–II, as contained in Defendants' Opposing Memorandum, submitted September 1, 1961:*

1. Was the plaintiff, in and after February 1954, equipped to, and did it make a legitimate *bona fide* effort to, enter the performance rights licensing business?

2. Did the defendants and ASCAP and Sesac, in and after February 1954, conspire to restrain trade and commerce in, or conspire to monopolize, and monopolize (all of which, if it existed at all, may have originated prior to February 1954), the business of licensing performance rights in musical compositions by:

(a) Agreeing to issue only blanket licenses [5] to users of performance rights, and denying other types of licenses to users, with the purpose and effect of rendering users financially unable to do business with other licensors of performance rights;

(b) Inducing licensees to refuse to do business with plaintiff;

(c) Inducing licensees, through their ownership, of stock in BMI, their receipt of rebates, discounts and services from BMI, and through the ownership of record producers, to use BMI musical compositions to the exclusion of others;

(d) Instructing broadcasters to refrain from playing records which did not bear BMI or ASCAP markings?

3. Did the defendants and ASCAP and Sesac, in and after February 1954, by reason of the foregoing, proximately prevent plaintiff from entering the performance rights licensing business?

---

5. A "blanket license" is defined to be an authorization to a user to perform any of the compositions in the licensor's catalogue at any time during the period of the license, the amount of the license fee not being dependent upon the number or frequency of the performances of the licensed music.

32

4. Did the plaintiff sustain direct pecuniary damage to its business or property by virtue thereof?

5. What was the amount of such damage?

N. B. The various Tenders of Issues have been reproduced verbatim. The court has made no effort in this Appendix to correct errors of grammar and punctuation.